# R. A. V. *v.* CITY OF ST. PAUL, MINNESOTA

No. 90–7675.   Argued December 4, 1991—Decided June 22, 1992

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, SOUTER, and THOMAS, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, in which BLACKMUN and O'CON-NOR, JJ., joined, and in which STEVENS, J., joined except as to Part I-A, *post*, p. 397. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 415. STEVENS, J., filed an opinion concurring in the judgment, in Part I of which WHITE and BLACKMUN, JJ., joined, *post*, p. 416.

*Edward J. Cleary* argued the cause for petitioner. With him on the briefs was *Michael F. Cromett.*

*Tom Foley* argued the cause for respondent. With him on the brief was *Steven C. DeCoster.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Steven R. Shapiro, John A. Powell,* and *Mark R. Anfinson;* for the Association of American Publishers et al. by

JUSTICE SCALIA delivered the opinion of the Court.

In the predawn hours of June 21, 1990, petitioner and several other teenagers allegedly assembled a crudely made cross by taping together broken chair legs. They then allegedly burned the cross inside the fenced yard of a black family that lived across the street from the house where petitioner was staying. Although this conduct could have been pun-

*Bruce J. Ennis;* and for the Center for Individual Rights by *Gary B. Born* and *Michael P. McDonald.*

Briefs of *amici curiae* urging affirmance were filed for the State of Minnesota et al. by *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Richard S. Slowes,* Assistant Attorney General, *Jimmy Evans,* Attorney General of Alabama, *Grant Woods,* Attorney General of Arizona, *Richard Blumenthal,* Attorney General of Connecticut, and *John J. Kelly,* Chief State's Attorney of Connecticut, *Larry EchoHawk,* Attorney General of Idaho, *Roland W. Burris,* Attorney General of Illinois, *Robert T. Stephan,* Attorney General of Kansas, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Scott Harshbarger,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Robert J. Del Tufo,* Attorney General of New Jersey, *Lee I. Fisher,* Attorney General of Ohio, *Susan B. Loving,* Attorney General of Oklahoma, *T. Travis Medlock,* Attorney General of South Carolina, *Charles W. Burson,* Attorney General of Tennessee, *Mary Sue Terry,* Attorney General of Virginia, and *Paul Van Dam,* Attorney General of Utah; for the Anti-Defamation League of B'nai B'rith by *Allen I. Saeks, Jeffrey P. Sinensky, Steven M. Freeman,* and *Michael Lieberman;* for the Asian American Legal Defense and Education Fund et al. by *Angelo N. Ancheta;* for the Center for Democratic Renewal et al. by *Frank E. Deale;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* for the League of Minnesota Cities et al. by *Carla J. Heyl, Robert J. Alfton,* and *Jerome J. Segal;* for the National Association for the Advancement of Colored People et al. by *Ronald D. Maines, Dennis C. Hayes, Willie Abrams,* and *Kemp R. Harshman;* for the National Black Women's Health Project by *Catharine A. MacKinnon* and *Burke Marshall;* for the National Institute of Municipal Law Officers et al. by *Richard Ruda, Michael J. Wahoske,* and *Mark B. Rotenberg;* and for People for the American Way by *Richard S. Hoffman, Kevin J. Hasson,* and *Elliot M. Mincberg.*

*Charles R. Sheppard* filed a brief for the Patriot's Defense Foundation, Inc., as *amicus curiae.*

ished under any of a number of laws,[1] one of the two provisions under which respondent city of St. Paul chose to charge petitioner (then a juvenile) was the St. Paul Bias-Motivated Crime Ordinance, St. Paul, Minn., Legis. Code § 292.02 (1990), which provides:

"Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor."

Petitioner moved to dismiss this count on the ground that the St. Paul ordinance was substantially overbroad and impermissibly content based and therefore facially invalid under the First Amendment.[2] The trial court granted this motion, but the Minnesota Supreme Court reversed. That court rejected petitioner's overbreadth claim because, as construed in prior Minnesota cases, see, *e. g., In re Welfare of S. L. J.,* 263 N. W. 2d 412 (Minn. 1978), the modifying phrase "arouses anger, alarm or resentment in others" limited the reach of the ordinance to conduct that amounts to "fighting words," *i. e.,* "conduct that itself inflicts injury or tends to incite immediate violence . . . ," *In re Welfare of R. A. V.,* 464 N. W. 2d 507, 510 (Minn. 1991) (citing *Chaplin-*

---

[1] The conduct might have violated Minnesota statutes carrying significant penalties. See, *e. g.,* Minn. Stat. § 609.713(1) (1987) (providing for up to five years in prison for terroristic threats); § 609.563 (arson) (providing for up to five years and a $10,000 fine, depending on the value of the property intended to be damaged); § 609.595 (Supp. 1992) (criminal damage to property) (providing for up to one year and a $3,000 fine, depending upon the extent of the damage to the property).

[2] Petitioner has also been charged, in Count I of the delinquency petition, with a violation of Minn. Stat. § 609.2231(4) (Supp. 1990) (racially motivated assaults). Petitioner did not challenge this count.

*sky* v. *New Hampshire*, 315 U. S. 568, 572 (1942)), and there-fore the ordinance reached only expression "that the first amendment does not protect," 464 N. W. 2d, at 511. The court also concluded that the ordinance was not impermissi-bly content based because, in its view, "the ordinance is a narrowly tailored means toward accomplishing the compel-ling governmental interest in protecting the community against bias-motivated threats to public safety and order." *Ibid.* We granted certiorari, 501 U. S. 1204 (1991).

## I

In construing the St. Paul ordinance, we are bound by the construction given to it by the Minnesota court. *Posadas de Puerto Rico Associates* v. *Tourism Co. of Puerto Rico*, 478 U. S. 328, 339 (1986); *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982); *Terminiello* v. *Chicago*, 337 U. S. 1, 4 (1949). Accordingly, we accept the Minnesota Supreme Court's au-thoritative statement that the ordinance reaches only those expressions that constitute "fighting words" within the meaning of *Chaplinsky.* 464 N. W. 2d, at 510–511. Peti-tioner and his *amici* urge us to modify the scope of the *Chaplinsky* formulation, thereby invalidating the ordinance as "substantially overbroad," *Broadrick* v. *Oklahoma*, 413 U. S. 601, 610 (1973). We find it unnecessary to consider this issue. Assuming, *arguendo*, that all of the expression reached by the ordinance is proscribable under the "fighting words" doctrine, we nonetheless conclude that the ordinance is facially unconstitutional in that it prohibits otherwise per-mitted speech solely on the basis of the subjects the speech addresses.[3]

---

[3] Contrary to JUSTICE WHITE's suggestion, *post*, at 397–398, n. 1, peti-tioner's claim is "fairly included" within the questions presented in the petition for certiorari, see this Court's Rule 14.1(a). It was clear from the petition and from petitioner's other filings in this Court (and in the courts below) that his assertion that the St. Paul ordinance "violat[es] over-breadth . . . principles of the First Amendment," Pet. for Cert. i, was *not*

382

The First Amendment generally prevents government from proscribing speech, see, e. g., *Cantwell* v. *Connecticut,* 310 U. S. 296, 309–311 (1940), or even expressive conduct, see, e. g., *Texas* v. *Johnson,* 491 U. S. 397, 406 (1989), because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid. *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 115 (1991); *id.,* at 124 (KENNEDY, J., concurring in judgment); *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 530, 536 (1980); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972). From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a

---

just a technical "overbreadth" claim—*i. e.,* a claim that the ordinance violated the rights of too many third parties—but included the contention that the ordinance was "overbroad" in the sense of restricting more speech than the Constitution permits, even in its application to him, because it is content based. An important component of petitioner's argument is, and has been all along, that narrowly construing the ordinance to cover only "fighting words" cannot cure this fundamental defect. *Id.,* at 12, 14, 15–16. In his briefs in this Court, petitioner argued that a narrowing construction was ineffective because (1) its boundaries were vague, Brief for Petitioner 26, and because (2) denominating particular expression a "fighting word" because of the impact of its ideological content upon the audience is inconsistent with the First Amendment, Reply Brief for Petitioner 5; *id.,* at 13 ("[The ordinance] is overbroad, *viewpoint discriminatory* and vague as 'narrowly construed'") (emphasis added). At oral argument, counsel for petitioner reiterated this second point: "It is . . . one of my positions, that·in [punishing only some fighting words and not others], even though it is a subcategory, technically, of unprotected conduct, [the ordinance] still is picking out an opinion, a disfavored message, and making that clear through the State." Tr. of Oral Arg. 8. In resting our judgment upon this contention, we have not departed from our criteria of what is "fairly included" within.the petition. See *Arkansas Electric Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n,* 461 U. S. 375, 382, n. 6 (1983); *Brown* v. *Socialist Workers '74 Campaign Comm.,* 459 U. S. 87, 94, n. 9 (1982); *Eddings* v. *Oklahoma,* 455 U. S. 104, 113, n. 9 (1982); see generally R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice 361 (6th ed. 1986).

few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky, supra,* at 572. We have recognized that "the freedom of speech" referred to by the First Amendment does not include a freedom to disregard these traditional limitations. See, *e. g., Roth* v. *United States,* 354 U. S. 476 (1957) (obscenity); *Beauharnais* v. *Illinois,* 343 U. S. 250 (1952) (defamation); *Chaplinsky* v. *New Hampshire, supra* ("'fighting' words"); see generally *Simon & Schuster, supra,* at 124 (KENNEDY, J., concurring in judgment). Our decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation, see *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974); see generally *Milkovich* v. *Lorain Journal Co.,* 497 U. S. 1, 13–17 (1990), and for obscenity, see *Miller* v. *California,* 413 U. S. 15 (1973), but a limited categorical approach has remained an important part of our First Amendment jurisprudence.

We have sometimes said that these categories of expression are "not within the area of constitutionally protected speech," *Roth, supra,* at 483; *Beauharnais, supra,* at 266; *Chaplinsky, supra,* at 571–572, or that the "protection of the First Amendment does not extend" to them, *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485, 504 (1984); *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115, 124 (1989). Such statements must be taken in context, however, and are no more literally true than is the occasionally repeated shorthand characterizing obscenity "as not being speech at all," Sunstein, Pornography and the First Amendment, 1986 Duke L. J. 589, 615, n. 46. What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for

content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government. We recently acknowledged this distinction in *Ferber*, 458 U. S., at 763, where, in upholding New York's child pornography law, we expressly recognized that there was no "question here of censoring a particular literary theme . . . ." See also *id.*, at 775 (O'CONNOR, J., concurring) ("As drafted, New York's statute does not attempt to suppress the communication of particular ideas").

Our cases surely do not establish the proposition that the First Amendment imposes no obstacle whatsoever to regulation of particular instances of such proscribable expression, so that the government "may regulate [them] freely," *post*, at 400 (WHITE, J., concurring in judgment). That would mean that a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government. Such a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.[4] It is

---

[4] JUSTICE WHITE concedes that a city council cannot prohibit only those legally obscene works that contain criticism of the city government, *post*, at 406, but asserts that to be the consequence, not of the First Amendment, but of the Equal Protection Clause. Such content-based discrimination would not, he asserts, "be rationally related to a legitimate government interest." *Ibid.* But of course the only *reason* that government interest is not a "legitimate" one is that it violates the First Amendment. This Court itself has occasionally fused the First Amendment into the Equal Protection Clause in this fashion, but at least with the acknowledgment (which JUSTICE WHITE cannot afford to make) that the First Amendment underlies its analysis. See *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972) (ordinance prohibiting only nonlabor picketing violated the Equal Protection Clause because there was no "appropriate governmental interest" supporting the distinction inasmuch as "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"); *Carey* v.

not true that "fighting words" have at most a *de minimis* expressive content, *ibid.*, or that their content is *in all respects* "worthless and undeserving of constitutional protection," *post*, at 401; sometimes they are quite expressive indeed. We have not said that they constitute *"no* part of the expression of ideas," but only that they constitute "no *essential* part of any exposition of ideas." *Chaplinsky, supra,* at 572 (emphasis added).

The proposition that a particular instance of speech can be proscribable on the basis of one feature (*e. g.,* obscenity) but not on the basis of another (*e. g.,* opposition to the city government) is commonplace and has found application in many contexts. We have long held, for example, that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not. See *Johnson,* 491 U. S., at 406–407. See also *Barnes* v. *Glen Theatre, Inc.,* 501 U. S. 560, 569–570 (1991) (plurality opinion); *id.,* at 573–574 (SCALIA, J., concurring in judgment); *id.,* at 581–582 (SOUTER, J., concurring in judgment); *United*

---

*Brown,* 447 U. S. 455 (1980). See generally *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 124 (1991) (KENNEDY, J., concurring in judgment).

JUSTICE STEVENS seeks to avoid the point by dismissing the notion of obscene antigovernment speech as "fantastical," *post*, at 418, apparently believing that any reference to politics prevents a finding of obscenity. Unfortunately for the purveyors of obscenity, that is obviously false. A shockingly hardcore pornographic movie that contains a model sporting a political tattoo can be found, *"taken as a whole,* [to] lac[k] serious literary, artistic, political, or scientific value," *Miller* v. *California,* 413 U. S. 15, 24 (1973) (emphasis added). Anyway, it is easy enough to come up with other illustrations of a content-based restriction upon "unprotected speech" that is obviously invalid: the antigovernment libel illustration mentioned earlier, for one. See *supra,* at 384. And of course the concept of racist fighting words is, unfortunately, anything but a "highly speculative hypothetica[l]," *post,* at 419.

*States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968). Similarly, we have upheld reasonable "time, place, or manner" restrictions, but only if they are "justified without reference to the content of the regulated speech." *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989) (internal quotation marks omitted); see also *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 298 (1984) (noting that the *O'Brien* test differs little from the standard applied to time, place, or manner restrictions). And just as the power to proscribe particular speech on the basis of a noncontent element (*e. g.,* noise) does not entail the power to proscribe the same speech on the basis of a content element; so also, the power to proscribe it on the basis of *one* content element (*e. g.,* obscenity) does not entail the power to proscribe it on the basis of *other* content elements.

In other words, the exclusion of "fighting words" from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a "nonspeech" element of communication. Fighting words are thus analogous to a noisy sound truck: Each is, as Justice Frankfurter recognized, a "mode of speech," *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (1951) (opinion concurring in result); both can be used to convey an idea; but neither has, in and of itself, a claim upon the First Amendment. As with the sound truck, however, so also with fighting words: The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed. Compare *Frisby* v. *Schultz,* 487 U. S. 474 (1988) (upholding, against facial challenge, a content-neutral ban on targeted residential picketing), with *Carey* v. *Brown,* 447 U. S. 455 (1980) (invalidating a ban on residential picketing that exempted labor picketing).[5]

---

[5] Although JUSTICE WHITE asserts that our analysis disregards "established principles of First Amendment law," *post,* at 415, he cites not a single case (and we are aware of none) that even involved, much less con-

The concurrences describe us as setting forth a new First Amendment principle that prohibition of constitutionally proscribable speech cannot be "underinclusiv[e]," *post*, at 402 (WHITE, J., concurring in judgment)—a First Amendment "absolutism" whereby "[w]ithin a particular 'proscribable' category of expression, . . . a government must either proscribe *all* speech or no speech at all," *post*, at 419 (STEVENS, J., concurring in judgment). That easy target is of the concurrences' own invention. In our view, the First Amendment imposes not an "underinclusiveness" limitation but a "content discrimination" limitation upon a State's prohibition of proscribable speech. There is no problem whatever, for example, with a State's prohibiting obscenity (and other forms of proscribable expression) only in certain media or markets, for although that prohibition would be "underinclusive," it would not discriminate on the basis of content. See, *e. g.*, *Sable Communications*, 492 U. S., at 124–126 (upholding 47 U. S. C. § 223(b)(1), which prohibits obscene *telephone* communications).

Even the prohibition against content discrimination that we assert the First Amendment requires is not absolute. It applies differently in the context of proscribable speech than in the area of fully protected speech. The rationale of the general prohibition, after all, is that content discrimination "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace," *Simon & Schuster*, 502 U. S., at 116; *Leathers* v. *Medlock*, 499 U. S. 439, 448 (1991); *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 383–384 (1984); *Consolidated Edison Co.*, 447 U. S., at 536; *Police Dept. of Chicago* v. *Mosley*, 408 U. S.,

sidered and resolved, the issue of content discrimination through regulation of "unprotected" speech—though we plainly *recognized* that as an issue in *New York* v. *Ferber*, 458 U. S. 747 (1982). It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.

388

at 95–98. But content discrimination among various instances of a class of proscribable speech often does not pose this threat.

When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class. To illustrate: A State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience*— *i. e.*, that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages. See *Kucharek* v. *Hanaway*, 902 F. 2d 513, 517 (CA7 1990), cert. denied, 498 U. S. 1041 (1991). And the Federal Government can criminalize only those threats of violence that are directed against the President, see 18 U. S. C. §871—since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President. See *Watts* v. *United States*, 394 U. S. 705, 707 (1969) (upholding the facial validity of §871 because of the "overwhelmin[g] interest in protecting the safety of [the] Chief Executive and in allowing him to perform his duties without interference from threats of physical violence"). But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities. And to take a final example (one mentioned by JUSTICE STEVENS, *post*, at 421–422), a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection, see *Virginia*

*State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 771–772 (1976)) is in its view greater there. Cf. *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374 (1992) (state regulation of airline advertising); *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447 (1978) (state regulation of lawyer advertising). But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion. See, *e. g.,* Los Angeles Times, Aug. 8, 1989, section 4, p. 6, col. 1.

Another valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular "secondary effects" of the speech, so that the regulation is *"justified* without reference to the content of the . . . speech," *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41, 48 (1986) (quoting, with emphasis, *Virginia State Bd. of Pharmacy, supra,* at 771); see also *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 71, n. 34 (1976) (plurality opinion); *id.,* at 80–82 (Powell, J., concurring); *Barnes,* 501 U. S., at 586 (SOUTER, J., concurring in judgment). A State could, for example, permit all obscene live performances except those involving minors. Moreover, since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. See *id.,* at 571 (plurality opinion); *id.,* at 577 (SCALIA, J., concurring in judgment); *id.,* at 582 (SOUTER, J., concurring in judgment); *FTC* v. *Superior Court Trial Lawyers Assn.,* 493 U. S. 411, 425–432 (1990); *O'Brien,* 391 U. S., at 376–377. Thus, for example, sexually derogatory "fighting words," among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices, 42 U. S. C. § 2000e–2; 29 CFR § 1604.11 (1991). See also 18

U. S. C. § 242; 42 U. S. C. §§ 1981, 1982. Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.

These bases for distinction refute the proposition that the selectivity of the restriction is "even arguably 'conditioned upon the sovereign's agreement with what a speaker may intend to say.'" *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 555 (1981) (STEVENS, J., dissenting in part) (citation omitted). There may be other such bases as well. Indeed, to validate such selectivity (where totally proscribable speech is at issue) it may not even be necessary to identify any particular "neutral" basis, so long as the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot. (We cannot think of any First Amendment interest that would stand in the way of a State's prohibiting only those obscene motion pictures with blue-eyed actresses.) Save for that limitation, the regulation of "fighting words," like the regulation of noisy speech, may address some offensive instances and leave other, equally offensive, instances alone. See *Posadas de Puerto Rico,* 478 U. S., at 342–343.[6]

---

[6] JUSTICE STEVENS cites a string of opinions as supporting his assertion that "selective regulation of speech based on content" is not presumptively invalid. *Post,* at 421–422. Analysis reveals, however, that they do not support it. To begin with, three of them did not command a majority of the Court, *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 63–73 (1976) (plurality opinion); *FCC* v. *Pacifica Foundation,* 438 U. S. 726, 744–748 (1978) (plurality opinion); *Lehman* v. *Shaker Heights,* 418 U. S. 298 (1974) (plurality opinion), and two others did not even discuss the First Amendment, *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374 (1992); *Jacob Siegel Co.* v. *FTC,* 327 U. S. 608 (1946). In any event, all that their contents establish is what we readily concede: that presumptive invalidity does not mean invariable invalidity, leaving room for such exceptions as reasonable and viewpoint-neutral content-based discrimination in nonpublic forums, see *Lehman, supra,* at 301–304; see also *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U. S. 788, 806 (1985), or with respect to certain speech by government employees, see *Broadrick* v. *Oklahoma,*

## II

Applying these principles to the St. Paul ordinance, we conclude that, even as narrowly construed by the Minnesota Supreme Court, the ordinance is facially unconstitutional. Although the phrase in the ordinance, "arouses anger, alarm or resentment in others," has been limited by the Minnesota Supreme Court's construction to reach only those symbols or displays that amount to "fighting words," the remaining, unmodified terms make clear that the ordinance applies only to "fighting words" that insult, or provoke violence, "on the basis of race, color, creed, religion or gender." Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects. See *Simon & Schuster*, 502 U. S., at 116; *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 229–230 (1987).

In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination. Displays containing some words—odious racial epithets, for example—would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying, for example, that all "anti-

---

413 U. S. 601 (1973); see also *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 564–567 (1973).

Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

What we have here, it must be emphasized, is not a prohibition of fighting words that are directed at certain persons or groups (which would be *facially* valid if it met the requirements of the Equal Protection Clause); but rather, a prohibition of fighting words that contain (as the Minnesota Supreme Court repeatedly emphasized) messages of "bias-motivated" hatred and in particular, as applied to this case, messages "based on virulent notions of racial supremacy." 464 N. W. 2d, at 508, 511. One must wholeheartedly agree with the Minnesota Supreme Court that "[i]t is the responsibility, even the obligation, of diverse communities to confront such notions in whatever form they appear," *id.*, at 508, but the manner of that confrontation cannot consist of selective limitations upon speech. St. Paul's brief asserts that a general "fighting words" law would not meet the city's needs because only a content-specific measure can communicate to minority groups that the "group hatred" aspect of such speech "is not condoned by the majority." Brief for Respondent 25. The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content.

Despite the fact that the Minnesota Supreme Court and St. Paul acknowledge that the ordinance is directed at expression of group hatred, JUSTICE STEVENS suggests that this "fundamentally misreads" the ordinance. *Post*, at 433. It is directed, he claims, not to speech of a particular content, but to particular "injur[ies]" that are "qualitatively different" from other injuries. *Post*, at 424. This is wordplay. What makes the anger, fear, sense of dishonor, etc., produced by violation of this ordinance distinct from the anger, fear, sense of dishonor, etc., produced by other fighting words is

nothing other than the fact that it is caused by a distinctive idea, conveyed by a distinctive message. The First Amendment cannot be evaded that easily. It is obvious that the symbols which will arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender" are those symbols that communicate a message of hostility based on one of these characteristics. St. Paul concedes in its brief that the ordinance applies only to "racial, religious, or gender-specific symbols" such as "a burning cross, Nazi swastika or other instrumentality of like import." Brief for Respondent 8. Indeed, St. Paul argued in the Juvenile Court that "[t]he burning of a cross does express a message and it is, in fact, the content of that message which the St. Paul Ordinance attempts to legislate." Memorandum from the Ramsey County Attorney to the Honorable Charles A. Flinn, Jr., dated July 13, 1990, in *In re Welfare of R. A. V.*, No. 89–D–1231 (Ramsey Cty. Juvenile Ct.), p. 1, reprinted in App. to Brief for Petitioner C–1.

The content-based discrimination reflected in the St. Paul ordinance comes within neither any of the specific exceptions to the First Amendment prohibition we discussed earlier nor a more general exception for content discrimination that does not threaten censorship of ideas. It assuredly does not fall within the exception for content discrimination based on the very reasons why the particular class of speech at issue (here, fighting words) is proscribable. As explained earlier, see *supra*, at 386, the reason why fighting words are categorically excluded from the protection of the First Amendment is not that their content communicates any particular idea, but that their content embodies a particularly intolerable (and socially unnecessary) *mode* of expressing *whatever* idea the speaker wishes to convey. St. Paul has not singled out an especially offensive mode of expression—it has not, for example, selected for prohibition only those fighting words that communicate ideas in a threatening (as opposed to a merely obnoxious) manner. Rather, it has proscribed fight-

ing words of whatever manner that communicate messages of racial, gender, or religious intolerance. Selectivity of this sort creates the possibility that the city is seeking to handicap the expression of particular ideas. That possibility would alone be enough to render the ordinance presumptively invalid, but St. Paul's comments and concessions in this case elevate the possibility to a certainty.

St. Paul argues that the ordinance comes within another of the specific exceptions we mentioned, the one that allows content discrimination aimed only at the "secondary effects" of the speech, see *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). According to St. Paul, the ordinance is intended, "not to impact on *[sic]* the right of free expression of the accused," but rather to "protect against the victimization of a person or persons who are particularly vulnerable because of their membership in a group that historically has been discriminated against." Brief for Respondent 28. Even assuming that an ordinance that completely proscribes, rather than merely regulates, a specified category of speech can ever be considered to be directed only to the secondary effects of such speech, it is clear that the St. Paul ordinance is not directed to secondary effects within the meaning of *Renton.* As we said in *Boos* v. *Barry*, 485 U. S. 312 (1988), "Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton.*" *Id.*, at 321. "The emotive impact of speech on its audience is not a 'secondary effect.'" *Ibid.* See also *id.*, at 334 (opinion of Brennan, J.).[7]

---

[7] St. Paul has not argued in this case that the ordinance merely regulates that subclass of fighting words which is most likely to provoke a violent response. But even if one assumes (as appears unlikely) that the categories selected may be so described, that would not justify selective regulation under a "secondary effects" theory. The only reason why such expressive conduct would be especially correlated with violence is that it conveys a particularly odious message; because the "chain of causation" thus *necessarily* "run[s] through the persuasive effect of the expressive component" of the conduct, *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 586 (1991) (Souter, J., concurring in judgment), it is clear that the St. Paul

It hardly needs discussion that the ordinance does not fall within some more general exception permitting *all* selectivity that for any reason is beyond the suspicion of official suppression of ideas. The statements of St. Paul in this very case afford ample basis for, if not full confirmation of, that suspicion.

Finally, St. Paul and its *amici* defend the conclusion of the Minnesota Supreme Court that, even if the ordinance regulates expression based on hostility towards its protected ideological content, this discrimination is nonetheless justified because it is narrowly tailored to serve compelling state interests. Specifically, they assert that the ordinance helps to ensure the basic human rights of members of groups that have historically been subjected to discrimination, including the right of such group members to live in peace where they wish. We do not doubt that these interests are compelling, and that the ordinance can be said to promote them. But the "danger of censorship" presented by a facially content-based statute, *Leathers* v. *Medlock*, 499 U. S., at 448, requires that that weapon be employed only where it is *"necessary* to serve the asserted [compelling] interest," *Burson* v. *Freeman*, 504 U. S. 191, 199 (1992) (plurality opinion) (emphasis added); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983). The existence of adequate content-neutral alternatives thus "undercut[s] significantly" any defense of such a statute, *Boos* v. *Barry, supra*, at 329, casting considerable doubt on the government's protestations that "the asserted justification is in fact an accurate description of the purpose and effect of the law," *Burson, supra*, at 213 (KENNEDY, J., concurring). See *Boos, supra*, at 324–329; cf. *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 586–587 (1983). The dispositive question in this case, therefore, is whether content discrimination is reasonably necessary to achieve St. Paul's compel-

─────────

ordinance regulates on the basis of the "primary" effect of the speech—*i. e.*, its persuasive (or repellant) force.

ling interests; it plainly is not. An ordinance not limited to the favored topics, for example, would have precisely the same beneficial effect. In fact the only interest distinctively served by the content limitation is that of displaying the city council's special hostility towards the particular biases thus singled out.[8] That is precisely what the First Amendment forbids. The politicians of St. Paul are entitled to express that hostility—but not through the means of imposing unique limitations upon speakers who (however benightedly) disagree.

*　*　*

Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means at its disposal to prevent such behavior without adding the First Amendment to the fire.

The judgment of the Minnesota Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[8] A plurality of the Court reached a different conclusion with regard to the Tennessee antielectioneering statute considered earlier this Term in *Burson* v. *Freeman,* 504 U. S. 191 (1992). In light of the "logical connection" between electioneering and the State's compelling interest in preventing voter intimidation and election fraud—an inherent connection borne out by a "long history" and a "widespread and time-tested consensus," *id.,* at 206, 208, n. 10, 211—the plurality concluded that it was faced with one of those "rare case[s]" in which the use of a facially content-based restriction was justified by interests unrelated to the suppression of ideas, *id.,* at 211; see also *id.,* at 213 (KENNEDY, J., concurring). JUSTICE WHITE and JUSTICE STEVENS are therefore quite mistaken when they seek to convert the *Burson* plurality's passing comment that "[t]he First Amendment does not require States to regulate for problems that do not exist," *id.,* at 207, into endorsement of the revolutionary proposition that the suppression of particular ideas can be justified when only those ideas have been a source of trouble in the past. *Post,* at 405 (WHITE, J., concurring in judgment); *post,* at 434 (STEVENS, J., concurring in judgment).

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join, and with whom JUSTICE STEVENS joins except as to Part I–A, concurring in the judgment.

I agree with the majority that the judgment of the Minnesota Supreme Court should be reversed. However, our agreement ends there.

This case could easily be decided within the contours of established First Amendment law by holding, as petitioner argues, that the St. Paul ordinance is fatally overbroad because it criminalizes not only unprotected expression but expression protected by the First Amendment. See Part II, *infra.* Instead, "find[ing] it unnecessary" to consider the questions upon which we granted review,[1] *ante,* at 381, the

---

[1] The Court granted certiorari to review the following questions:

"1. May a local government enact a content-based, 'hate-crime' ordinance prohibiting the display of symbols, including a Nazi swastika or a burning cross, on public or private property, which one knows or has reason to know arouses anger, alarm, or resentment in others on the basis of race, color, creed, religion, or gender without violating overbreadth and vagueness principles of the First Amendment to the United States Constitution?

"2. Can the constitutionality of such a vague and substantially overbroad content-based restraint of expression be saved by a limiting construction, like that used to save the vague and overbroad content-neutral laws, restricting its application to 'fighting words' or 'imminent lawless action?'" Pet. for Cert. i.

It has long been the rule of this Court that "[o]nly the questions set forth in the petition, or fairly included therein, will be considered by the Court." This Court's Rule 14.1(a). This Rule has served to focus the issues presented for review. But the majority reads the Rule so expansively that any First Amendment theory would appear to be "fairly included" within the questions quoted above.

Contrary to the impression the majority attempts to create through its selective quotation of petitioner's briefs, see *ante,* at 381–382, n. 3, petitioner did not present to this Court or the Minnesota Supreme Court anything approximating the novel theory the majority adopts today. Most certainly petitioner did not "reiterat[e]" such a claim at argument; he responded to a question from the bench, Tr. of Oral Arg. 8. Previously, this Court has shown the restraint to refrain from deciding cases on the basis

Court holds the ordinance facially unconstitutional on a ground that was never presented to the Minnesota Supreme Court, a ground that has not been briefed by the parties before this Court, a ground that requires serious departures from the teaching of prior cases and is inconsistent with the plurality opinion in *Burson* v. *Freeman*, 504 U. S. 191 (1992), which was joined by two of the five Justices in the majority in the present case.

This Court ordinarily is not so eager to abandon its precedents. Twice within the past month, the Court has declined to overturn longstanding but controversial decisions on questions of constitutional law. See *Allied-Signal, Inc.* v. *Director, Division of Taxation*, 504 U. S. 768 (1992); *Quill Corp.* v. *North Dakota*, 504 U. S. 298 (1992). In each case, we had the benefit of full briefing on the critical issue, so that the parties and *amici* had the opportunity to apprise us of the impact of a change in the law. And in each case, the Court declined to abandon its precedents, invoking the principle of *stare decisis*. *Allied-Signal, Inc., supra*, at 783–786; *Quill Corp., supra*, at 317–318.

But in the present case, the majority casts aside long-established First Amendment doctrine without the benefit of briefing and adopts an untried theory. This is hardly a judicious way of proceeding, and the Court's reasoning in reaching its result is transparently wrong.

---

of its own theories when they have not been pressed or passed upon by a state court of last resort. See, *e. g., Illinois* v. *Gates*, 462 U. S. 213, 217–224 (1983).

Given this threshold issue, it is my view that the Court lacks jurisdiction to decide the case on the majority rationale. Cf. *Arkansas Electric Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n*, 461 U. S. 375, 382, n. 6 (1983). Certainly the preliminary jurisdictional and prudential concerns are sufficiently weighty that we would never have granted certiorari had petitioner sought review of a question based on the majority's decisional theory.

I

A

This Court's decisions have plainly stated that expression falling within certain limited categories so lacks the values the First Amendment was designed to protect that the Constitution affords no protection to that expression. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942), made the point in the clearest possible terms:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*, at 571–572.

See also *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 504 (1984) (citing *Chaplinsky*).

Thus, as the majority concedes, see *ante*, at 383–384, this Court has long held certain discrete categories of expression to be proscribable on the basis of their content. For instance, the Court has held that the individual who falsely shouts "fire" in a crowded theater may not claim the protection of the First Amendment. *Schenck* v. *United States*, 249 U. S. 47, 52 (1919). The Court has concluded that neither child pornography nor obscenity is protected by the First Amendment. *New York* v. *Ferber*, 458 U. S. 747, 764 (1982); *Miller* v. *California*, 413 U. S. 15, 20 (1973); *Roth* v. *United States*, 354 U. S. 476, 484–485 (1957). And the Court has observed that, "[l]eaving aside the special considerations when public officials [and public figures] are the target, a libelous publication is not protected by the Constitution." *Ferber, supra*, at 763 (citations omitted).

All of these categories are content based. But the Court
has held that the First Amendment does not apply to them
because their expressive content is worthless or of *de mini-
mis* value to society. *Chaplinsky, supra,* at 571–572. We
have not departed from this principle, emphasizing repeat-
edly that, "within the confines of [these] given classifica-
tion[s], the evil to be restricted so overwhelmingly outweighs
the expressive interests, if any, at stake, that no process of
case-by-case adjudication is required." *Ferber, supra,* at
763–764; *Bigelow* v. *Virginia,* 421 U. S. 809, 819 (1975). This
categorical approach has provided a principled and narrowly
focused means for distinguishing between expression that
the government may regulate freely and that which it may
regulate on the basis of content only upon a showing of com-
pelling need.[2]

Today, however, the Court announces that earlier Courts
did not mean their repeated statements that certain catego-
ries of expression are "not within the area of constitutionally
protected speech." *Roth, supra,* at 483. See *ante,* at 383,
citing *Beauharnais* v. *Illinois,* 343 U. S. 250, 266 (1952);
*Chaplinsky, supra,* at 571–572; *Bose Corp., supra,* at 504;
*Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115,
124 (1989). The present Court submits that such clear
statements "must be taken in context" and are not "literally
true." *Ante,* at 383.

To the contrary, those statements meant precisely what
they said: The categorical approach is a firmly entrenched
part of our First Amendment jurisprudence. Indeed, the
Court in *Roth* reviewed the guarantees of freedom of expres-
sion in effect at the time of the ratification of the Constitu-
tion and concluded, "In light of this history, it is apparent
that the unconditional phrasing of the First Amendment was

[2] "In each of these areas, the limits of the unprotected category, as well
as the unprotected character of particular communications, have been de-
termined by the judicial evaluation of special facts that have been deemed
to have constitutional significance." *Bose Corp.* v. *Consumers Union of
United States, Inc.,* 466 U. S. 485, 504–505 (1984).

not intended to protect every utterance." 354 U. S., at 482–483.

In its decision today, the Court points to "[n]othing . . . in this Court's precedents warrant[ing] disregard of this long-standing tradition." *Burson*, 504 U. S., at 216 (SCALIA, J., concurring in judgment); *Allied-Signal, Inc., supra*, at 783. Nevertheless, the majority holds that the First Amendment protects those narrow categories of expression long held to be undeserving of First Amendment protection—at least to the extent that lawmakers may not regulate some fighting words more strictly than others because of their content. The Court announces that such content-based distinctions violate the First Amendment because "[t]he government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *Ante*, at 386. Should the government want to criminalize certain fighting words, the Court now requires it to criminalize all fighting words.

To borrow a phrase: "Such a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with our jurisprudence as well." *Ante*, at 384. It is inconsistent to hold that the government may proscribe an entire category of speech because the content of that speech is evil, *Ferber, supra*, at 763–764; but that the government may not treat a subset of that category differently without violating the First Amendment; the content of the subset is by definition worthless and undeserving of constitutional protection.

The majority's observation that fighting words are "quite expressive indeed," *ante*, at 385, is no answer. Fighting words are not a means of exchanging views, rallying supporters, or registering a protest; they are directed against individuals to provoke violence or to inflict injury. *Chaplinsky*, 315 U. S., at 572. Therefore, a ban on all fighting words or on a subset of the fighting words category would restrict only the social evil of hate speech, without creating the danger of driving viewpoints from the marketplace. See *ante*, at 387.

Therefore, the Court's insistence on inventing its brand of First Amendment underinclusiveness puzzles me.[3] The overbreadth doctrine has the redeeming virtue of attempting to avoid the chilling of protected expression, *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973); *Osborne* v. *Ohio*, 495 U. S. 103, 112, n. 8 (1990); *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 503 (1985); *Ferber, supra*, at 772, but the Court's new "underbreadth" creation serves no desirable function. Instead, it permits, indeed invites, the continuation of expressive conduct that in this case is evil and worthless in First Amendment terms, see *Ferber, supra*, at 763–764; *Chaplinsky, supra*, at 571–572, until the city of St. Paul cures the underbreadth by adding to its ordinance a catchall phrase such as "and all other fighting words that may constitutionally be subject to this ordinance."

Any contribution of this holding to First Amendment jurisprudence is surely a negative one, since it necessarily signals that expressions of violence, such as the message of intimidation and racial hatred conveyed by burning a cross on someone's lawn, are of sufficient value to outweigh the social interest in order and morality that has traditionally placed such fighting words outside the First Amendment.[4] Indeed, by characterizing fighting words as a form of "debate," *ante*, at 392, the majority legitimates hate speech as a form of public discussion.

---

[3] The assortment of exceptions the Court attaches to its rule belies the majority's claim, see *ante*, at 387, that its new theory is truly concerned with content discrimination. See Part I–C, *infra* (discussing the exceptions).

[4] This does not suggest, of course, that cross burning is always unprotected. Burning a cross at a political rally would almost certainly be protected expression. Cf. *Brandenburg* v. *Ohio*, 395 U. S. 444, 445 (1969). But in such a context, the cross burning could not be characterized as a "direct personal insult or an invitation to exchange fisticuffs," *Texas* v. *Johnson*, 491 U. S. 397, 409 (1989), to which the fighting words doctrine, see Part II, *infra*, applies.

Furthermore, the Court obscures the line between speech that could be regulated freely on the basis of content (*i. e.*, the narrow categories of expression falling outside the First Amendment) and that which could be regulated on the basis of content only upon a showing of a compelling state interest (*i. e.*, all remaining expression). By placing fighting words, which the Court has long held to be valueless, on at least equal constitutional footing with political discourse and other forms of speech that we have deemed to have the greatest social value, the majority devalues the latter category. See *Burson* v. *Freeman, supra,* at 196; *Eu* v. *San Francisco Cty. Democratic Central Comm.,* 489 U. S. 214, 222–223 (1989).

## B

In a second break with precedent, the Court refuses to sustain the ordinance even though it would survive under the strict scrutiny applicable to other protected expression. Assuming, *arguendo,* that the St. Paul ordinance is a content-based regulation of protected expression, it nevertheless would pass First Amendment review under settled law upon a showing that the regulation " 'is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' " *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 118 (1991) (quoting *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221, 231 (1987)). St. Paul has urged that its ordinance, in the words of the majority, "helps to ensure the basic human rights of members of groups that have historically been subjected to discrimination . . . ." *Ante,* at 395. The Court expressly concedes that this interest is compelling and is promoted by the ordinance. *Ibid.* Nevertheless, the Court treats strict scrutiny analysis as irrelevant to the constitutionality of the legislation:

> "The dispositive question . . . is whether content discrimination is reasonably necessary to achieve St. Paul's compelling interests; it plainly is not. An ordinance not

limited to the favored topics, for example, would have precisely the same beneficial effect." *Ante,* at 395–396.

Under the majority's view, a narrowly drawn, content-based ordinance could never pass constitutional muster if the object of that legislation could be accomplished by banning a wider category of speech. This appears to be a general renunciation of strict scrutiny review, a fundamental tool of First Amendment analysis.[5]

This abandonment of the doctrine is inexplicable in light of our decision in *Burson* v. *Freeman,* 504 U. S. 191 (1992), which was handed down just a month ago.[6] In *Burson,* seven of the eight participating Members of the Court agreed that the strict scrutiny standard applied in a case involving a First Amendment challenge to a content-based statute. See *id.,* at 198 (plurality opinion); *id.,* at 217 (STEVENS, J.,

---

[5] The majority relies on *Boos* v. *Barry,* 485 U. S. 312 (1988), in arguing that the availability of content-neutral alternatives "'undercut[s] significantly'" a claim that content-based legislation is "'*necessary* to serve the asserted [compelling] interest.'" *Ante,* at 395 (quoting *Boos, supra,* at 329, and *Burson* v. *Freeman,* 504 U. S. 191, 199 (1992) (plurality opinion)). *Boos* does not support the majority's analysis. In *Boos,* Congress already had decided that the challenged legislation was not necessary, and the Court pointedly deferred to this choice. 485 U. S., at 329. St. Paul lawmakers have made no such legislative choice.

Moreover, in *Boos,* the Court held that the challenged statute was not narrowly tailored because a less restrictive alternative was available. *Ibid.* But the Court's analysis today turns *Boos* inside-out by substituting the majority's policy judgment that a *more* restrictive alternative could adequately serve the compelling need identified by St. Paul lawmakers. The result would be: (a) a statute that was not tailored to fit the need identified by the government; and (b) a greater restriction on fighting words, even though the Court clearly believes that fighting words have protected expressive content. *Ante,* at 384–385.

[6] Earlier this Term, seven of the eight participating Members of the Court agreed that strict scrutiny analysis applied in *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105 (1991), in which we struck down New York's "Son of Sam" law, which required "that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account." *Id.,* at 108.

dissenting).[7] The statute at issue prohibited the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place. The plurality concluded that the legislation survived strict scrutiny because the State had asserted a compelling interest in regulating electioneering near polling places and because the statute at issue was narrowly tailored to accomplish that goal. *Id.*, at 208–210.

Significantly, the statute in *Burson* did not proscribe all speech near polling places; it restricted only political speech. *Id.*, at 197. The *Burson* plurality, which included THE CHIEF JUSTICE and JUSTICE KENNEDY, concluded that the distinction between types of speech required application of strict scrutiny, but it squarely rejected the proposition that the legislation failed First Amendment review because it could have been drafted in broader, content-neutral terms:

> "States adopt laws to address the problems that confront them. *The First Amendment does not require States to regulate for problems that do not exist.*" *Id.*, at 207 (emphasis added).

This reasoning is in direct conflict with the majority's analysis in the present case, which leaves two options to lawmakers attempting to regulate expressions of violence: (1) enact a sweeping prohibition on an entire class of speech (thereby requiring "regulat[ion] for problems that do not exist"); or (2) not legislate at all.

Had the analysis adopted by the majority in the present case been applied in *Burson*, the challenged election law would have failed constitutional review, for its content-based distinction between political and nonpolitical speech could not have been characterized as "reasonably necessary," *ante*,

---

[7]The *Burson* dissenters did not complain that the plurality erred in applying strict scrutiny; they objected that the plurality was not sufficiently rigorous in its review. 504 U.S., at 225–226 (STEVENS, J., dissenting).

at 395, to achieve the State's interest in regulating polling place premises.[8]

As with its rejection of the Court's categorical analysis, the majority offers no reasoned basis for discarding our firmly established strict scrutiny analysis at this time. The majority appears to believe that its doctrinal revisionism is necessary to prevent our elected lawmakers from prohibiting libel against members of one political party but not another and from enacting similarly preposterous laws. *Ante*, at 384. The majority is misguided.

Although the First Amendment does not apply to categories of unprotected speech, such as fighting words, the Equal Protection Clause requires that the regulation of unprotected speech be rationally related to a legitimate government interest. A defamation statute that drew distinctions on the basis of political affiliation or "an ordinance prohibiting only those legally obscene works that contain criticism of the city government," *ibid.*, would unquestionably fail rational-basis review.[9]

---

[8] JUSTICE SCALIA concurred in the judgment in *Burson*, reasoning that the statute, "though content based, is constitutional [as] a reasonable, viewpoint-neutral regulation of a nonpublic forum." *Id.*, at 214. However, nothing in his reasoning in the present case suggests that a content-based ban on fighting words would be constitutional were that ban limited to nonpublic fora. Taken together, the two opinions suggest that, in some settings, political speech, to which "the First Amendment 'has its fullest and most urgent application,'" is entitled to less constitutional protection than fighting words. *Eu* v. *San Francisco Cty. Democratic Central Comm.*, 489 U. S. 214, 223 (1989) (quoting *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971)).

[9] The majority is mistaken in stating that a ban on obscene works critical of government would fail equal protection review only because the ban would violate the First Amendment. *Ante*, at 384–385, n. 4. While decisions such as *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972), recognize that First Amendment principles may be relevant to an equal protection claim challenging distinctions that impact on protected expression, *id.*, at 95–99, there is no basis for linking First and Fourteenth Amendment analysis in a case involving unprotected expression. Certainly, one

Turning to the St. Paul ordinance and assuming, *arguendo*, as the majority does, that the ordinance is not constitutionally overbroad (but see Part II, *infra*), there is no question that it would pass equal protection review. The ordinance proscribes a subset of "fighting words," those that injure "on the basis of race, color, creed, religion or gender." This selective regulation reflects the city's judgment that harms based on race, color, creed, religion, or gender are more pressing public concerns than the harms caused by other fighting words. In light of our Nation's long and painful experience with discrimination, this determination is plainly reasonable. Indeed, as the majority concedes, the interest is compelling. *Ante*, at 395.

## C

The Court has patched up its argument with an apparently nonexhaustive list of ad hoc exceptions, in what can be viewed either as an attempt to confine the effects of its decision to the facts of this case, see *post*, at 415 (BLACKMUN, J., concurring in judgment), or as an effort to anticipate some of the questions that will arise from its radical revision of First Amendment law.

For instance, if the majority were to give general application to the rule on which it decides this case, today's decision would call into question the constitutionality of the statute making it illegal to threaten the life of the President. 18 U. S. C. § 871. See *Watts* v. *United States*, 394 U. S. 705 (1969) *(per curiam)*. Surely, this statute, by singling out certain threats, incorporates a content-based distinction; it indicates that the Government especially disfavors threats against the President as opposed to threats against all oth-

---

need not resort to First Amendment principles to conclude that the sort of improbable legislation the majority hypothesizes is based on senseless distinctions.

ers.[10]   See *ante*, at 391.   But because the Government could
prohibit all threats and not just those directed against the
President, under the Court's theory, the compelling reasons
justifying the enactment of special legislation to safeguard
the President would be irrelevant, and the statute would fail
First Amendment review.

To save the statute, the majority has engrafted the follow-
ing exception onto its newly announced First Amendment
rule: Content-based distinctions may be drawn within an
unprotected category of speech if the basis for the distinc-
tions is "the very reason the entire class of speech at issue
is proscribable." *Ante*, at 388.   Thus, the argument goes,
the statute making it illegal to threaten the life of the Presi-
dent is constitutional, "since the reasons why threats of vio-
lence are outside the First Amendment (protecting individu-
als from the fear of violence, from the disruption that fear
engenders, and from the possibility that the threatened vio-
lence will occur) have special force when applied to the per-
son of the President." *Ibid.*

The exception swallows the majority's rule.   Certainly, it
should apply to the St. Paul ordinance, since "the reasons
why [fighting words] are outside the First Amendment . . .
have special force when applied to [groups that have histori-
cally been subjected to discrimination]."

To avoid the result of its own analysis, the Court suggests
that fighting words are simply a mode of communication,
rather than a content-based category, and that the St. Paul
ordinance has not singled out a particularly objectionable
mode of communication.   *Ante*, at 386, 393.   Again, the ma-
jority confuses the issue.   A prohibition on fighting words is
not a time, place, or manner restriction; it is a ban on a class
of speech that conveys an overriding message of personal
injury and imminent violence, *Chaplinsky*, 315 U. S., at 572,
a message that is at its ugliest when directed against groups

---

[10] Indeed, such a law is content based in and of itself because it distin-
guishes between threatening and nonthreatening speech.

that have long been the targets of discrimination. Accordingly, the ordinance falls within the first exception to the majority's theory.

As its second exception, the Court posits that certain content-based regulations will survive under the new regime if the regulated subclass "happens to be associated with particular 'secondary effects' of the speech . . . ," *ante,* at 389, which the majority treats as encompassing instances in which "words can . . . violate laws directed not against speech but against conduct . . . ," *ibid.*[11] Again, there is a simple explanation for the Court's eagerness to craft an exception to its new First Amendment rule: Under the general rule the Court applies in this case, Title VII hostile work environment claims would suddenly be unconstitutional.

Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate "because of [an] individual's race, color, religion, sex, or national origin," 42 U. S. C. § 2000e–2(a)(1), and the regulations covering hostile workplace claims forbid "sexual harassment," which includes "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" that create "an intimidating, hostile, or offensive working environment," 29 CFR § 1604.11(a) (1991). The regulation does not prohibit workplace harassment generally; it focuses on what the majority would characterize as the "disfavored topi[c]" of sexual harassment. *Ante,* at 391. In this way, Title VII is similar to the St. Paul ordinance that the majority condemns because it "impose[s] special prohibitions on those speakers who express views on disfavored subjects." *Ibid.* Under the broad principle the Court uses to decide the present case,

---

[11] The consequences of the majority's conflation of the rarely used secondary effects standard and the *O'Brien* test for conduct incorporating "speech" and "nonspeech" elements, see generally *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968), present another question that I fear will haunt us and the lower courts in the aftermath of the majority's opinion.

hostile work environment claims based on sexual harassment should fail First Amendment review; because a general ban on harassment in the workplace would cover the problem of sexual harassment, any attempt to proscribe the subcategory of sexually harassing expression would violate the First Amendment.

Hence, the majority's second exception, which the Court indicates would insulate a Title VII hostile work environment claim from an underinclusiveness challenge because "sexually derogatory 'fighting words' . . . may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *Ante,* at 389. But application of this exception to a hostile work environment claim does not hold up under close examination.

First, the hostile work environment regulation is not keyed to the presence or absence of an economic *quid pro quo, Meritor Savings Bank, F. S. B.* v. *Vinson,* 477 U. S. 57, 65 (1986), but to the impact of the speech on the victimized worker. Consequently, the regulation would no more fall within a secondary effects exception than does the St. Paul ordinance. *Ante,* at 394. Second, the majority's focus on the statute's general prohibition on discrimination glosses over the language of the specific regulation governing hostile working environment, which reaches beyond any "incidental" effect on speech. *United States* v. *O'Brien,* 391 U. S. 367, 376 (1968). If the relationship between the broader statute and specific regulation is sufficent to bring the Title VII regulation within *O'Brien,* then all St. Paul need do to bring its ordinance within this exception is to add some prefatory language concerning discrimination generally.

As to the third exception to the Court's theory for deciding this case, the majority concocts a catchall exclusion to protect against unforeseen problems, a concern that is heightened here given the lack of briefing on the majority's decisional theory. This final exception would apply in cases in which "there is no realistic possibility that official suppression of ideas is afoot." *Ante,* at 390. As I have demon-

strated, this case does not concern the official suppression of ideas. See *supra*, at 401. The majority discards this notion out of hand. *Ante*, at 395.

As I see it, the Court's theory does not work and will do nothing more than confuse the law. Its selection of this case to rewrite First Amendment law is particularly inexplicable, because the whole problem could have been avoided by deciding this case under settled First Amendment principles.

## II

Although I disagree with the Court's analysis, I do agree with its conclusion: The St. Paul ordinance is unconstitutional. However, I would decide the case on overbreadth grounds.

We have emphasized time and again that overbreadth doctrine is an exception to the established principle that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick* v. *Oklahoma*, 413 U. S., at 610; *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S., at 503–504. A defendant being prosecuted for speech or expressive conduct may challenge the law on its face if it reaches protected expression, even when that person's activities are not protected by the First Amendment. This is because "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Broadrick, supra*, at 612; *Osborne* v. *Ohio*, 495 U. S., at 112, n. 8; *New York* v. *Ferber*, 458 U. S., at 768–769; *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 634 (1980); *Gooding* v. *Wilson*, 405 U. S. 518, 521 (1972).

However, we have consistently held that, because overbreadth analysis is "strong medicine," it may be invoked to strike an entire statute only when the overbreadth of the statute is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep," *Broad-*

*rick*, 413 U. S., at 615, and when the statute is not suscepti-ble to limitation or partial invalidation, *id.*, at 613; *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 574 (1987). "When a federal court is dealing with a federal statute challenged as overbroad, it should . . . con-strue the statute to avoid constitutional problems, if the stat-ute is subject to a limiting construction." *Ferber*, 458 U. S., at 769, n. 24. Of course, "[a] state court is also free to deal with a state statute in the same way." *Ibid.* See, *e. g.*, *Osborne*, 495 U. S., at 113–114.

Petitioner contends that the St. Paul ordinance is not sus-ceptible to a narrowing construction and that the ordinance therefore should be considered as written, and not as con-strued ·by the Minnesota Supreme Court. Petitioner is wrong. Where a state court has interpreted a provision of state law, we cannot ignore that interpretation, even if it is not one that we would have reached if we were construing the statute in the first instance. *Ibid.; Kolender* v. *Lawson*, 461 U. S. 352, 355 (1983); *Hoffman Estates* v. *Flipside, Hoff-man Estates, Inc.*, 455 U. S. 489, 494, n. 5 (1982).[12]

Of course, the mere presence of a state court interpreta-tion does not insulate a statute from overbreadth review. We have stricken legislation when the construction supplied by the state court failed to cure the overbreadth problem.

---

[12]Petitioner can derive no support from our statement in *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 397 (1988), that "the stat-ute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements." In *American Booksellers*, no state court had construed the language in dispute. In that instance, we certified a question to the state court so that it would have an opportunity to provide a narrowing interpretation. *Ibid.* In *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 216 (1975), the other case upon which petitioner principally relies, we observed not only that the ordi-nance at issue was not "by its plain terms . . . easily susceptible of a narrowing construction," but that the state courts had made no effort to restrict the scope of the statute when it was challenged on overbreadth grounds.

See, *e. g., Lewis* v. *New Orleans,* 415 U. S. 130, 132–133 (1974); *Gooding, supra,* at 524–525. But in such cases, we have looked to the statute as construed in determining whether it contravened the First Amendment. Here, the Minnesota Supreme Court has provided an authoritative construction of the St. Paul antibias ordinance. Consideration of petitioner's overbreadth claim must be based on that interpretation.

I agree with petitioner that the ordinance is invalid on its face. Although the ordinance as construed reaches categories of speech that are constitutionally unprotected, it also criminalizes a substantial amount of expression that—however repugnant—is shielded by the First Amendment.

In attempting to narrow the scope of the St. Paul antibias ordinance, the Minnesota Supreme Court relied upon two of the categories of speech and expressive conduct that fall outside the First Amendment's protective sphere: words that incite "imminent lawless action," *Brandenburg* v. *Ohio,* 395 U. S. 444, 449 (1969), and "fighting" words, *Chaplinsky* v. *New Hampshire,* 315 U. S., at 571–572. The Minnesota Supreme Court erred in its application of the *Chaplinsky* fighting words test and consequently interpreted the St. Paul ordinance in a fashion that rendered the ordinance facially overbroad.

In construing the St. Paul ordinance, the Minnesota Supreme Court drew upon the definition of fighting words that appears in *Chaplinsky*—words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.,* at 572. However, the Minnesota court was far from clear in identifying the "injur[ies]" inflicted by the expression that St. Paul sought to regulate. Indeed, the Minnesota court emphasized (tracking the language of the ordinance) that "the ordinance censors only those displays that one knows or should know will create anger, alarm or resentment based on racial, ethnic, gender or religious bias." *In re Welfare of R. A. V.,* 464 N. W. 2d 507, 510 (1991). I

therefore understand the court to have ruled that St. Paul may constitutionally prohibit expression that "by its very utterance" causes "anger, alarm or resentment."

Our fighting words cases have made clear, however, that such generalized reactions are not sufficient to strip expression of its constitutional protection. The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected. See *United States* v. *Eichman,* 496 U. S. 310, 319 (1990); *Texas* v. *Johnson,* 491 U. S. 397, 409, 414 (1989); *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46, 55–56 (1988); *FCC* v. *Pacifica Foundation,* 438 U. S. 726, 745 (1978); *Hess* v. *Indiana,* 414 U. S. 105, 107–108 (1973); *Cohen* v. *California,* 403 U. S. 15, 20 (1971); *Street* v. *New York,* 394 U. S. 576, 592 (1969); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949).

In the First Amendment context, "[c]riminal statutes must be scrutinized with particular care; those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Houston* v. *Hill,* 482 U. S. 451, 459 (1987) (citation omitted). The St. Paul antibias ordinance is such a law. Although the ordinance reaches conduct that is unprotected, it also makes criminal expressive conduct that causes only hurt feelings, offense, or resentment, and is protected by the First Amendment. Cf. *Lewis, supra,* at 132.[13] The ordinance is therefore fatally overbroad and invalid on its face.

---

[13] Although the First Amendment protects offensive speech, *Johnson* v. *Texas,* 491 U. S., at 414, it does not require us to be subjected to such expression at all times, in all settings. We have held that such expression may be proscribed when it intrudes upon a "captive audience." *Frisby* v. *Schultz,* 487 U. S. 474, 484–485 (1988); *FCC* v. *Pacifica Foundation,* 438 U. S. 726, 748–749 (1978). And expression may be limited when it merges into conduct. *United States* v. *O'Brien,* 391 U. S. 367 (1968); cf. *Meritor Savings Bank, F. S. B.* v. *Vinson,* 477 U. S. 57, 65 (1986). However, because of the manner in which the Minnesota Supreme Court construed the St. Paul ordinance, those issues are not before us in this case.

## III

Today, the Court has disregarded two established principles of First Amendment law without providing a coherent replacement theory. Its decision is an arid, doctrinaire interpretation, driven by the frequently irresistible impulse of judges to tinker with the First Amendment. The decision is mischievous at best and will surely confuse the lower courts. I join the judgment, but not the folly of the opinion.

JUSTICE BLACKMUN, concurring in the judgment.

I regret what the Court has done in this case. The majority opinion signals one of two possibilities: It will serve as precedent for future cases, or it will not. Either result is disheartening.

In the first instance, by deciding that a State cannot regulate speech that causes great harm unless it also regulates speech that does not (setting law and logic on their heads), the Court seems to abandon the categorical approach, and inevitably to relax the level of scrutiny applicable to content-based laws. As JUSTICE WHITE points out, this weakens the traditional protections of speech. If all expressive activity must be accorded the same protection, that protection will be scant. The simple reality is that the Court will never provide child pornography or cigarette advertising the level of protection customarily granted political speech. If we are forbidden to categorize, as the Court has done here, we shall reduce protection across the board. It is sad that in its effort to reach a satisfying result in this case, the Court is willing to weaken First Amendment protections.

In the second instance is the possibility that this case will not significantly alter First Amendment jurisprudence but, instead, will be regarded as an aberration—a case where the Court manipulated doctrine to strike down an ordinance whose premise it opposed, namely, that racial threats and verbal assaults are of greater harm than other fighting words. I fear that the Court has been distracted from its

proper mission by the temptation to decide the issue over "politically correct speech" and "cultural diversity," neither of which is presented here. If this is the meaning of today's opinion, it is perhaps even more regrettable.

I see no First Amendment values that are compromised by a law that prohibits hoodlums from driving minorities out of their homes by burning crosses on their lawns, but I see great harm in preventing the people of Saint Paul from specifically punishing the race-based fighting words that so prejudice their community.

I concur in the judgment, however, because I agree with JUSTICE WHITE that this particular ordinance reaches beyond fighting words to speech protected by the First Amendment.

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE BLACKMUN join as to Part I, concurring in the judgment.

Conduct that creates special risks or causes special harms may be prohibited by special rules. Lighting a fire near an ammunition dump or a gasoline storage tank is especially dangerous; such behavior may be punished more severely than burning trash in a vacant lot. Threatening someone because of her race or religious beliefs may cause particularly severe trauma or touch off a riot, and threatening a high public official may cause substantial social disruption; such threats may be punished more severely than threats against someone based on, say, his support of a particular athletic team. There are legitimate, reasonable, and neutral justifications for such special rules.

This case involves the constitutionality of one such ordinance. Because the regulated conduct has some communicative content—a message of racial, religious, or gender hostility—the ordinance raises two quite different First Amendment questions. Is the ordinance "overbroad" be-

cause it prohibits too much speech? If not, is it "underbroad" because it does not prohibit enough speech?

In answering these questions, my colleagues today wrestle with two broad principles: first, that certain "categories of expression [including 'fighting words'] are 'not within the area of constitutionally protected speech,'" *ante*, at 400 (WHITE, J., concurring in judgment); and second, that "[c]ontent-based regulations [of expression] are presumptively invalid," *ante*, at 382 (majority opinion). Although in past opinions the Court has repeated both of these maxims, it has—quite rightly—adhered to neither with the absolutism suggested by my colleagues. Thus, while I agree that the St. Paul ordinance is unconstitutionally overbroad for the reasons stated in Part II of JUSTICE WHITE's opinion, I write separately to suggest how the allure of absolute principles has skewed the analysis of both the majority and JUSTICE WHITE's opinions.

I

Fifty years ago, the Court articulated a categorical approach to First Amendment jurisprudence.

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942).

We have, as JUSTICE WHITE observes, often described such categories of expression as "not within the area of constitutionally protected speech." *Roth* v. *United States*, 354 U. S. 476, 483 (1957).

The Court today revises this categorical approach. It is not, the Court rules, that certain "categories" of expression are "unprotected," but rather that certain "elements" of expression are wholly "proscribable." To the Court, an expressive act, like a chemical compound, consists of more than one element. Although the act may be regulated because it contains a proscribable element, it may not be regulated on the basis of another (nonproscribable) element it also contains. Thus, obscene antigovernment speech may be regulated because it is obscene, but not because it is antigovernment. *Ante*, at 384. It is this revision of the categorical approach that allows the Court to assume that the St. Paul ordinance proscribes *only* fighting words, while at the same time concluding that the ordinance is invalid because it imposes a content-based regulation on expressive activity.

As an initial matter, the Court's revision of the categorical approach seems to me something of an adventure in a doctrinal wonderland, for the concept of "obscene antigovernment" speech is fantastical. The category of the obscene is very narrow; to be obscene, expression must be found by the trier of fact to "appea[l] to the prurient interest, . . . depic[t] or describ[e], in a patently offensive way, sexual conduct, [and], taken as a whole, *lac[k] serious literary, artistic, political, or scientific value.*" *Miller* v. *California*, 413 U. S. 15, 24 (1973) (emphasis added). "Obscene antigovernment" speech, then, is a contradiction in terms: If expression is antigovernment, it does not "lac[k] serious . . . political . . . value" and cannot be obscene.

The Court attempts to bolster its argument by likening its novel analysis to that applied to restrictions on the time, place, or manner of expression or on expressive conduct. It is true that loud speech in favor of the Republican Party can be regulated because it is loud, but not because it is pro-Republican; and it is true that the public burning of the American flag can be regulated because it involves public burning and not because it involves the flag. But these anal-

ogies are inapposite. In each of these examples, the two elements (*e. g.,* loudness and pro-Republican orientation) can coexist; in the case of "obscene antigovernment" speech, however, the presence of one element ("obscenity") by definition means the absence of the other. To my mind, it is unwise and unsound to craft a new doctrine based on such highly speculative hypotheticals.

I am, however, even more troubled by the second step of the Court's analysis—namely, its conclusion that the St. Paul ordinance is an unconstitutional content-based regulation of speech. Drawing on broadly worded dicta, the Court establishes a near-absolute ban on content-based regulations of expression and holds that the First Amendment prohibits the regulation of fighting words by subject matter. Thus, while the Court rejects the "all-or-nothing-at-all" nature of the categorical approach, *ante,* at 384, it promptly embraces an absolutism of its own: Within a particular "proscribable" category of expression, the Court holds, a government must either proscribe *all* speech or no speech at all.[1] This aspect of the Court's ruling fundamentally misunderstands the role and constitutional status of content-based regulations on speech, conflicts with the very nature of First Amendment jurisprudence, and disrupts well-settled principles of First Amendment law.

---

[1] The Court disputes this characterization because it has crafted two exceptions, one for "certain media or markets" and the other for content discrimination based upon "the very reason that the entire class of speech at issue is proscribable." *Ante,* at 388. These exceptions are, at best, ill defined. The Court does not tell us whether, with respect to the former, fighting words such as cross burning could be proscribed only in certain neighborhoods where the threat of violence is particularly severe, or whether, with respect to the second category, fighting words that create a particular risk of harm (such as a race riot) would be proscribable. The hypothetical and illusory category of these two exceptions persuades me that either my description of the Court's analysis is accurate or that the Court does not in fact mean much of what it says in its opinion.

Although the Court has, on occasion, declared that content-based regulations of speech are "never permitted," *Police Dept. of Chicago v. Mosley*, 408 U. S. 92, 99 (1972), such claims are overstated. Indeed, in *Mosley* itself, the Court indicated that Chicago's selective proscription of non-labor picketing was not *per se* unconstitutional, but rather could be upheld if the city demonstrated that nonlabor picketing was "clearly more disruptive than [labor] picketing." *Id.*, at 100. Contrary to the broad dicta in *Mosley* and elsewhere, our decisions demonstrate that content-based distinctions, far from being presumptively invalid, are an inevitable and indispensable aspect of a coherent understanding of the First Amendment.

This is true at every level of First Amendment law. In broadest terms, our entire First Amendment jurisprudence creates a regime based on the content of speech. The scope of the First Amendment is determined by the content of expressive activity: Although the First Amendment broadly protects "speech," it does not protect the right to "fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort." Schauer, Categories and the First Amendment: A Play in Three Acts, 34 Vand. L. Rev. 265, 270 (1981). Whether an agreement among competitors is a violation of the Sherman Act or protected activity under the *Noerr-Pennington* doctrine[2] hinges upon the content of the agreement. Similarly, "the line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which the speech occurs, but also on exactly what the speaker had to say." *Young v. American Mini Theatres, Inc.*, 427 U. S. 50, 66 (1976) (plurality opinion); see also *Musser v. Utah*, 333 U. S. 95, 100–103 (1948) (Rutledge, J., dissenting).

---

[2] See *Mine Workers v. Pennington*, 381 U. S. 657 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961).

Likewise, whether speech falls within one of the categories of "unprotected" or "proscribable" expression is determined, in part, by its content. Whether a magazine is obscene, a gesture a fighting word, or a photograph child pornography is determined, in part, by its content. Even within categories of protected expression, the First Amendment status of speech is fixed by its content. *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.,* 472 U. S. 749 (1985), establish that the level of protection given to speech depends upon its subject matter: Speech about public officials or matters of public concern receives greater protection than speech about other topics. It can, therefore, scarcely be said that the regulation of expressive activity cannot be predicated on its content: Much of our First Amendment jurisprudence is premised on the assumption that content makes a difference.

Consistent with this general premise, we have frequently upheld content-based regulations of speech. For example, in *Young* v. *American Mini Theatres,* the Court upheld zoning ordinances that regulated movie theaters based on the content of the films shown. In *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978) (plurality opinion), we upheld a restriction on the broadcast of *specific* indecent words. In *Lehman* v. *Shaker Heights,* 418 U. S. 298 (1974) (plurality opinion), we upheld a city law that permitted commercial advertising, but prohibited political advertising, on city buses. In *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973), we upheld a state law that restricted the speech of state employees, but only as concerned partisan political matters. We have long recognized the power of the Federal Trade Commission to regulate misleading advertising and labeling, see, *e. g., Jacob Siegel Co.* v. *FTC,* 327 U. S. 608 (1946), and the National Labor Relations Board's power to regulate an employer's election-related speech on the basis of its content, see, *e. g., NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 616–618 (1969).

It is also beyond question that the Government may choose to limit advertisements for cigarettes, see 15 U. S. C. §§ 1331–1340,[3] but not for cigars; choose to regulate airline advertising, see *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374 (1992), but not bus advertising; or choose to monitor solicitation by lawyers, see *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), but not by doctors.

All of these cases involved the selective regulation of speech based on content—precisely the sort of regulation the Court invalidates today. Such selective regulations are unavoidably content based, but they are not, in my opinion, "presumptively invalid." As these many decisions and examples demonstrate, the prohibition on content-based regulations is not nearly as total as the *Mosley* dictum suggests.

Disregarding this vast body of case law, the Court today goes beyond even the overstatement in *Mosley* and applies the prohibition on content-based regulation to speech that the Court had until today considered wholly "unprotected" by the First Amendment—namely, fighting words. This new absolutism in the prohibition of content-based regulations severely contorts the fabric of settled First Amendment law.

Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all. Assuming that the Court is correct that this last class of speech is not wholly "unprotected," it certainly does not follow that fighting words and obscenity receive the *same* sort of protection afforded core political speech. Yet in ruling that proscribable speech cannot be regulated based on subject

[3] See also *Packer Corp.* v. *Utah*, 285 U. S. 105 (1932) (Brandeis, J.) (upholding a statute that prohibited the advertisement of cigarettes on billboards and streetcar placards).

matter, the Court does just that.[4]  Perversely, this gives fighting words *greater* protection than is afforded commercial speech.  If Congress can prohibit false advertising directed at airline passengers without also prohibiting false advertising directed at bus passengers and if a city can prohibit political advertisements in its buses while allowing other advertisements, it is ironic to hold that a city cannot regulate fighting words based on "race, color, creed, religion or gender" while leaving unregulated fighting words based on "union membership . . . or homosexuality."  *Ante*, at 391.  The Court today turns First Amendment law on its head: Communication that was once entirely unprotected (and that still can be wholly proscribed) is now entitled to greater protection than commercial speech—and possibly greater protection than core political speech.  See *Burson* v. *Freeman*, 504 U. S. 191, 195, 196 (1992).

Perhaps because the Court recognizes these perversities, it quickly offers some ad hoc limitations on its newly extended prohibition on content-based regulations.  First, the Court states that a content-based regulation is valid "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech . . . is proscribable."  *Ante*, at 388.  In a pivotal passage, the Court writes:

> "[T]he Federal Government can criminalize only those threats of violence that are directed against the President, see 18 U. S. C. §871—since the reasons why

---

[4] The Court states that the prohibition on content-based regulations "applies differently in the context of proscribable speech" than in the context of other speech, *ante*, at 387, but its analysis belies that claim.  The Court strikes down the St. Paul ordinance because it regulates fighting words based on subject matter, despite the fact that, as demonstrated above, we have long upheld regulations of commercial speech based on subject matter.  The Court's self-description is inapt: By prohibiting the regulation of fighting words based on its subject matter, the Court provides the same protection to fighting words as is currently provided to core political speech.

threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the . . . President." *Ibid.*

As I understand this opaque passage, Congress may choose from the set of unprotected speech (all threats) to proscribe only a subset (threats against the President) because those threats are particularly likely to cause "fear of violence," "disruption," and actual "violence."

Precisely this same reasoning, however, compels the conclusion that St. Paul's ordinance is constitutional. Just as Congress may determine that threats against the President entail more severe consequences than other threats, so St. Paul's City Council may determine that threats based on the target's race, religion, or gender cause more severe harm to both the target and to society than other threats. This latter judgment—that harms caused by racial, religious, and gender-based invective are qualitatively different from that caused by other fighting words—seems to me eminently reasonable and realistic.

Next, the Court recognizes that a State may regulate advertising in one industry but not another because "the risk of fraud (one of the characteristics . . . that justifies depriving [commercial speech] of full First Amendment protection . . .)" in the regulated industry is "greater" than in other industries. *Ibid.* Again, the same reasoning demonstrates the constitutionality of St. Paul's ordinance. "[O]ne of the characteristics that justifies" the constitutional status of fighting words is that such words "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U. S., at 572. Certainly a legislature that may determine that the risk of fraud is greater in the legal

trade than in the medical trade may determine that the risk of injury or breach of peace created by race-based threats is greater than that created by other threats.

Similarly, it is impossible to reconcile the Court's analysis of the St. Paul ordinance with its recognition that "a prohibition of fighting words that are directed at certain persons or groups . . . would be facially valid." *Ante*, at 392 (emphasis deleted). A selective proscription of unprotected expression designed to protect "certain persons or groups" (for example, a law proscribing threats directed at the elderly) would be constitutional if it were based on a legitimate determination that the harm created by the regulated expression differs from that created by the unregulated expression (that is, if the elderly are more severely injured by threats than are the nonelderly). Such selective protection is no different from a law prohibiting minors (and only minors) from obtaining obscene publications. See *Ginsberg* v. *New York*, 390 U. S. 629 (1968). St. Paul has determined—reasonably in my judgment—that fighting-word injuries "based on race, color, creed, religion or gender" are qualitatively different and more severe than fighting-word injuries based on other characteristics. Whether the selective proscription of proscribable speech is defined by the protected target ("certain persons or groups") or the basis of the harm (injuries "based on race, color, creed, religion or gender") makes no constitutional difference: What matters is whether the legislature's selection is based on a legitimate, neutral, and reasonable distinction.

In sum, the central premise of the Court's ruling—that "[c]ontent-based regulations are presumptively invalid"—has simplistic appeal, but lacks support in our First Amendment jurisprudence. To make matters worse, the Court today extends this overstated claim to reach categories of hitherto unprotected speech and, in doing so, wreaks havoc in an area of settled law. Finally, although the Court recog-

nizes exceptions to its new principle, those exceptions under-
mine its very conclusion that the St. Paul ordinance is uncon-
stitutional. Stated directly, the majority's position cannot
withstand scrutiny.

## II

Although I agree with much of JUSTICE WHITE's analysis,
I do not join Part I–A of his opinion because I have reserva-
tions about the "categorical approach" to the First Amend-
ment. These concerns, which I have noted on other occa-
sions, see, e. g., New York v. Ferber, 458 U. S. 747, 778 (1982)
(opinion concurring in judgment), lead me to find JUSTICE
WHITE's response to the Court's analysis unsatisfying.

Admittedly, the categorical approach to the First Amend-
ment has some appeal: Either expression is protected or it
is not—the categories create safe harbors for governments
and speakers alike. But this approach sacrifices subtlety for
clarity and is, I am convinced, ultimately unsound. As an
initial matter, the concept of "categories" fits poorly with the
complex reality of expression. Few dividing lines in First
Amendment law are straight and unwavering, and efforts at
categorization inevitably give rise only to fuzzy boundaries.
Our definitions of "obscenity," see, e. g., Marks v. United
States, 430 U. S. 188, 198 (1977) (STEVENS, J., concurring in
part and dissenting in part), and "public forum," see, e. g.,
United States Postal Service v. Council of Greenburgh Civic
Assns., 453 U. S. 114, 126–131 (1981); id., at 136–140 (Bren-
nan, J., concurring in judgment); id., at 147–151 (Marshall,
J., dissenting); id., at 152–154 (STEVENS, J., dissenting) (all
debating the definition of "public forum"), illustrate this all
too well. The quest for doctrinal certainty through the
definition of categories and subcategories is, in my opinion,
destined to fail.

Moreover, the categorical approach does not take seriously
the importance of context. The meaning of any expression
and the legitimacy of its regulation can only be determined

in context.[5] Whether, for example, a picture or a sentence is obscene cannot be judged in the abstract, but rather only in the context of its setting, its use, and its audience. Similarly, although legislatures may freely regulate most nonobscene child pornography, such pornography that is part of "a serious work of art, a documentary on behavioral problems, or a medical or psychiatric teaching device" may be entitled to constitutional protection; the "question whether a specific act of communication is protected by the First Amendment always requires some consideration of both its content and its context." *Ferber*, 458 U. S., at 778 (STEVENS, J., concurring in judgment); see also *Smith* v. *United States*, 431 U. S. 291, 311–321 (1977) (STEVENS, J., dissenting). The categorical approach sweeps too broadly when it declares that all such expression is beyond the protection of the First Amendment.

Perhaps sensing the limits of such an all-or-nothing approach, the Court has applied its analysis less categorically than its doctrinal statements suggest. The Court has recognized intermediate categories of speech (for example, for indecent nonobscene speech and commercial speech) and geographic categories of speech (public fora, limited public fora, nonpublic fora) entitled to varying levels of protection. The Court has also stringently delimited the categories of unprotected speech. While we once declared that "[l]ibelous utterances [are] not . . . within the area of constitutionally protected speech," *Beauharnais* v. *Illinois*, 343 U. S. 250, 266 (1952), our rulings in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), and *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749 (1985), have substantially qualified this

---

[5] "A word," as Justice Holmes has noted, "is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne* v. *Eisner*, 245 U. S. 418, 425 (1918); see also *Jacobellis* v. *Ohio*, 378 U. S. 184, 201 (1964) (Warren, C. J., dissenting).

broad claim. Similarly, we have consistently construed the "fighting words" exception set forth in *Chaplinsky* narrowly. See, *e. g., Houston* v. *Hill,* 482 U. S. 451 (1987); *Lewis* v. *New Orleans,* 415 U. S. 130 (1974); *Cohen* v. *California,* 403 U. S. 15 (1971). In the case of commercial speech, our ruling that "the Constitution imposes no . . . restraint on government [regulation] as respects purely commercial advertising," *Valentine* v. *Chrestensen,* 316 U. S. 52, 54 (1942), was expressly repudiated in *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976). In short, the history of the categorical approach is largely the history of narrowing the categories of unprotected speech.

This evolution, I believe, indicates that the categorical approach is unworkable and the quest for absolute categories of "protected" and "unprotected" speech ultimately futile. My analysis of the faults and limits of this approach persuades me that the categorical approach presented in Part I-A of JUSTICE WHITE's opinion is not an adequate response to the novel "underbreadth" analysis the Court sets forth today.

## III

As the foregoing suggests, I disagree with both the Court's and part of JUSTICE WHITE's analysis of the constitutionality of the St. Paul ordinance. Unlike the Court, I do not believe that all content-based regulations are equally infirm and presumptively invalid; unlike JUSTICE WHITE, I do not believe that fighting words are wholly unprotected by the First Amendment. To the contrary, I believe our decisions establish a more complex and subtle analysis, one that considers the content and context of the regulated speech, and the nature and scope of the restriction on speech. Applying this analysis and assuming, *arguendo,* (as the Court does) that the St. Paul ordinance is *not* overbroad, I conclude that such a selective, subject-matter regulation on proscribable speech is constitutional.

Not all content-based regulations are alike; our decisions clearly recognize that some content-based restrictions raise more constitutional questions than others. Although the Court's analysis of content-based regulations cannot be reduced to a simple formula, we have considered a number of factors in determining the validity of such regulations.

First, as suggested above, the scope of protection provided expressive activity depends in part upon its content and character. We have long recognized that when government regulates political speech or "the expression of editorial opinion on matters of public importance," *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 375–376 (1984), "First Amendment protectio[n] is 'at its zenith,'" *Meyer* v. *Grant*, 486 U. S. 414, 425 (1988). In comparison, we have recognized that "commercial speech receives a limited form of First Amendment protection," *Posadas de Puerto Rico Associates* v. *Tourism Co. of Puerto Rico*, 478 U. S. 328, 340 (1986), and that "society's interest in protecting [sexually explicit films] is of a wholly different, and lesser, magnitude than [its] interest in untrammeled political debate," *Young* v. *American Mini Theatres*, 427 U. S., at 70; see also *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978). The character of expressive activity also weighs in our consideration of its constitutional status. As we have frequently noted, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas* v. *Johnson*, 491 U. S. 397, 406 (1989); see also *United States* v. *O'Brien*, 391 U. S. 367 (1968).

The protection afforded expression turns as well on the context of the regulated speech. We have noted, for example, that "[a]ny assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting . . . [and] must take into account the economic dependence of the employees on their employers." *NLRB* v. *Gissel Packing Co.*, 395 U. S., at 617. Similarly, the distinctive character of a university environment, see

*Widmar* v. *Vincent,* 454 U. S. 263, 277–280 (1981) (STEVENS, J., concurring in judgment), or a secondary school environment, see *Hazelwood School Dist.* v. *Kuhlmeier,* 484 U. S. 260 (1988), influences our First Amendment analysis. The same is true of the presence of a "'captive audience[, one] there as a matter of necessity, not of choice.'" *Lehman* v. *Shaker Heights,* 418 U. S., at 302 (citation omitted).[6] Perhaps the most familiar embodiment of the relevance of context is our "fora" jurisprudence, differentiating the levels of protection afforded speech in different locations.

The nature of a contested restriction of speech also informs our evaluation of its constitutionality. Thus, for example, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963). More particularly to the matter of content-based regulations, we have implicitly distinguished between restrictions on expression based on *subject matter* and restrictions based on *viewpoint,* indicating that the latter are particularly pernicious. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas* v. *Johnson,* 491 U. S., at 414. "Viewpoint discrimination is censorship in its purest form," *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 62 (1983) (Brennan, J., dissenting), and requires particular scrutiny, in part because such regulation often indicates a legislative effort to skew public debate on an issue, see, *e. g., Schacht* v. *United States,* 398 U. S. 58, 63 (1970). "Especially where . . . the legislature's suppression of speech suggests an attempt

---

[6] Cf. *In re Chase,* 468 F. 2d 128, 139–140 (CA7 1972) (Stevens, J., dissenting) (arguing that defendant who, for reasons of religious belief, refused to rise and stand as the trial judge entered the courtroom was not subject to contempt proceedings because he was not present in the courtroom "as a matter of choice").

to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 785–786 (1978). Thus, although a regulation that on its face regulates speech by subject matter may in some instances effectively suppress particular viewpoints, see, *e. g., Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 546–547 (1980) (STEVENS, J., concurring in judgment), in general, viewpoint-based restrictions on expression require greater scrutiny than subject-matter-based restrictions.[7]

Finally, in considering the validity of content-based regulations we have also looked more broadly at the scope of the restrictions. For example, in *Young* v. *American Mini Theatres*, 427 U. S., at 71, we found significant the fact that "what [was] ultimately at stake [was] nothing more than a limitation on the place where adult films may be exhibited." Similarly, in *FCC* v. *Pacifica Foundation*, the Court emphasized two dimensions of the limited scope of the FCC ruling. First, the ruling concerned only broadcast material which presents particular problems because it "confronts the citizen . . . in the privacy of the home"; second, the ruling was not a complete ban on the use of selected offensive words, but rather merely a limitation on the times such speech could be broadcast. 438 U. S., at 748–750.

All of these factors play some role in our evaluation of content-based regulations on expression. Such a multi-faceted analysis cannot be conflated into two dimensions. Whatever the allure of absolute doctrines, it is just too simple to declare expression "protected" or "unprotected" or to proclaim a regulation "content based" or "content neutral."

---

[7] Although the Court has sometimes suggested that subject-matter-based and viewpoint-based regulations are equally problematic, see, *e. g., Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S., at 537, our decisions belie such claims.

In applying this analysis to the St. Paul ordinance, I assume, *arguendo*—as the Court does—that the ordinance regulates *only* fighting words and therefore is not overbroad. Looking to the content and character of the regulated activity, two things are clear. First, by hypothesis the ordinance bars only low-value speech, namely, fighting words. By definition such expression constitutes "no essential part of any exposition of ideas, and [is] of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U. S., at 572. Second, the ordinance regulates "expressive conduct [rather] than . . . the written or spoken word." *Texas* v. *Johnson*, 491 U. S., at 406.

Looking to the context of the regulated activity, it is again significant that the ordinance (by hypothesis) regulates *only* fighting words. Whether words are fighting words is determined in part by their context. Fighting words are not words that merely cause offense; fighting words must be directed at individuals so as to "by their very utterance inflict injury." By hypothesis, then, the St. Paul ordinance restricts speech in confrontational and potentially violent situations. The case at hand is illustrative. The cross burning in this case—directed as it was to a single African-American family trapped in their home—was nothing more than a crude form of physical intimidation. That this cross burning sends a message of racial hostility does not automatically endow it with complete constitutional protection.[8]

---

[8] The Court makes much of St. Paul's description of the ordinance as regulating "a message." *Ante*, at 393. As always, however, St. Paul's argument must be read in context:

"Finally, we ask the Court to reflect on the·'content' of the 'expressive conduct' represented by a 'burning cross.' It is no less than the first step in an act of racial violence. It was and unfortunately still is the equivalent of [the] waving of a knife before the thrust, the pointing of a gun before it is fired, the lighting of the match before the arson, the hanging of the noose before the lynching. It is not a political statement, or even

Significantly, the St. Paul ordinance regulates speech not on the basis of its subject matter or the viewpoint expressed, but rather on the basis of the *harm* the speech causes. In this regard, the Court fundamentally misreads the St. Paul ordinance. The Court describes the St. Paul ordinance as regulating expression "addressed to one of [several] specified disfavored *topics*," *ante*, at 391 (emphasis supplied), as policing "disfavored *subjects*," *ibid.* (emphasis supplied), and as "prohibit[ing] . . . speech solely on the basis of the *subjects* the speech addresses," *ante*, at 381 (emphasis supplied). Contrary to the Court's suggestion, the ordinance regulates only a subcategory of expression that causes *injuries based on* "race, color, creed, religion or gender," not a subcategory that involves *discussions* that concern those characteristics.[9] The ordinance, as construed by the Court, criminalizes expression that "one knows . . . [by its very utterance inflicts injury on] others on the basis of race, color, creed, religion or

---

a cowardly statement of hatred. It is the first step in an act of assault. It can be no more protected than holding a gun to a victim['s] head. It is perhaps the ultimate expression of 'fighting words.'" App. to Brief for Petitioner C-6.

[9] The Court contends that this distinction is "wordplay," reasoning that "[w]hat makes [the harms caused by race-based threats] distinct from [the harms] produced by other fighting words is . . . the fact that [the former are] caused by a *distinctive idea.*" *Ante*, at 392–393 (emphasis added). In this way, the Court concludes that regulating speech based on the injury it causes is no different from regulating speech based on its subject matter. This analysis fundamentally miscomprehends the role of "race, color, creed, religion [and] gender" in contemporary American society. One need look no further than the recent social unrest in the Nation's cities to see that race-based threats may cause more harm to society and to individuals than other threats. Just as the statute prohibiting threats against the President is justifiable because of the place of the President in our social and political order, so a statute prohibiting race-based threats is justifiable because of the place of race in our social and political order. Although it is regrettable that race occupies such a place and is so incendiary an issue, until the Nation matures beyond that condition, laws such as St. Paul's ordinance will remain reasonable and justifiable.

gender." In this regard, the ordinance resembles the child pornography law at issue in *Ferber*, which in effect singled out child pornography because those publications caused far greater harms than pornography involving adults.

Moreover, even if the St. Paul ordinance did regulate fighting words based on its subject matter, such a regulation would, in my opinion, be constitutional. As noted above, subject-matter-based regulations on commercial speech are widespread and largely unproblematic. As we have long recognized, subject-matter regulations generally do not raise the same concerns of government censorship and the distortion of public discourse presented by viewpoint regulations. Thus, in upholding subject-matter regulations we have carefully noted that viewpoint-based discrimination was not implicated. See *Young* v. *American Mini Theatres*, 427 U. S., at 67 (emphasizing "the need for absolute neutrality by the government," and observing that the contested statute was not animated by "hostility for the point of view" of the theaters); *FCC* v. *Pacifica Foundation*, 438 U. S., at 745–746 (stressing that "government must remain neutral in the marketplace of ideas"); see also *FCC* v. *League of Women's Voters of Cal.*, 468 U. S., at 412–417 (STEVENS, J., dissenting); *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 554–555 (1981) (STEVENS, J., dissenting in part). Indeed, some subject-matter restrictions are a functional necessity in contemporary governance: "The First Amendment does not require States to regulate for problems that do not exist." *Burson* v. *Freeman*, 504 U. S., at 207.

Contrary to the suggestion of the majority, the St. Paul ordinance does *not* regulate expression based on viewpoint. The Court contends that the ordinance requires proponents of racial intolerance to "follow the Marquis of Queensberry rules" while allowing advocates of racial tolerance to "fight freestyle." The law does no such thing.

The Court writes:

> "One could hold up a sign saying, for example, that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion.'" *Ante,* at 391–392.

This may be true, but it hardly proves the Court's point. The Court's reasoning is asymmetrical. The response to a sign saying that "all [religious] bigots are misbegotten" is a sign saying that "all advocates of religious tolerance are misbegotten." Assuming such signs could be fighting words (which seems to me extremely unlikely), neither sign would be banned by the ordinance for the attacks were not "based on . . . religion" but rather on one's beliefs about tolerance. Conversely (and again assuming such signs are fighting words), just as the ordinance would prohibit a Muslim from hoisting a sign claiming that all Catholics were misbegotten, so the ordinance would bar a Catholic from hoisting a similar sign attacking Muslims.

The St. Paul ordinance is evenhanded. In a battle between advocates of tolerance and advocates of intolerance, the ordinance does not prevent either side from hurling fighting words at the other on the basis of their conflicting ideas, but it does bar *both* sides from hurling such words on the basis of the target's "race, color, creed, religion or gender." To extend the Court's pugilistic metaphor, the St. Paul ordinance simply bans punches "below the belt"— *by either party.* It does not, therefore, favor one side of any debate.[10]

---

[10] Cf. *FCC* v. *League of Women Voters of Cal.,* 468 U. S. 364, 418 (1984) (STEVENS, J., dissenting) ("In this case . . . the regulation applies . . . to a defined class of . . . licensees [who] represent heterogenous points of view. There is simply no sensible basis for considering this regulation a viewpoint restriction—or . . . to condemn it as 'content-based'—because it applies equally to station owners of all shades of opinion").

Finally, it is noteworthy that the St. Paul ordinance is, as construed by the Court today, quite narrow. The St. Paul ordinance does not ban all "hate speech," nor does it ban, say, all cross burnings or all swastika displays. Rather it only bans a subcategory of the already narrow category of fighting words. Such a limited ordinance leaves open and protected a vast range of expression on the subjects of racial, religious, and gender equality. As construed by the Court today, the ordinance certainly does not "'rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" *Ante*, at 387. Petitioner is free to burn a cross to announce a rally or to express his views about racial supremacy, he may do so on private property or public land, at day or at night, so long as the burning is not so threatening and so directed at an individual as to "by its very [execution] inflict injury." Such a limited proscription scarcely offends the First Amendment.

In sum, the St. Paul ordinance (as construed by the Court) regulates expressive activity that is wholly proscribable and does so not on the basis of viewpoint, but rather in recognition of the different harms caused by such activity. Taken together, these several considerations persuade me that the St. Paul ordinance is not an unconstitutional content-based regulation of speech. Thus, were the ordinance not overbroad, I would vote to uphold it.