134 F.3d 63
 26 Media L. Rep. 1097
 ECLIPSE ENTERPRISES, INC., d/b/a Eclipse Comics and Wantagh
Distributors, Inc., d/b/a Collectors Comics,
Plaintiffs-Appellees,
v.
Thomas GULOTTA, individually and in his capacity as County
Executive of the County of Nassau, Donald Kane, individually
and in his capacity as Commissioner of the Nassau County
Police Department, Joseph Mondello, Bruce Nyman, Donald
DeRiggi, Benjamin Zwirn and Lewis Yevoli, individually and
in their capacity as members of the Nassau County Board of
Supervisors and The County of Nassau, Defendants-Appellants.
 No. 320, Docket 97-7099.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 2, 1997.
Decided Dec. 9, 1997.
 
 Robert D. Balin, Lankenau, Kovner, Kurtz & Outten, LLP, New York City (Edward J. Klaris, Lankenau, Kovner, Kurtz & Outten, LLP, New York City, Marjorie Heins, American Civil Liberties Union Foundation, Art Censorship Project, New York City, of counsel), for Plaintiffs-Appellees.
 Martin B. Adams, Kopff, Nardelli & Dopf LLP, New York City (Alexander G. Moody, Kopff, Nardelli & Dopf LLP, New York City, of counsel), for Defendants-Appellants.
 Before: MINER and LEVAL, Circuit Judges, and GRIESA, District Judge.*
 GRIESA, District Judge, concurred in the result in a separate opinion.
 MINER, Circuit Judge:
 
 
 1
 Defendants Thomas Gulotta, County Executive of Nassau County, Donald Kane, Commissioner of the Nassau County Police Department, Joseph Mondello, Bruce Nyman, Donald DeRiggi, Benjamin Zwirn and Lewis Yevoli, each a member of the Nassau County Board of Supervisors, and the County of Nassau appeal from a summary judgment entered in the United States District Court for the Eastern District of New York (Spatt, J.). The judgment was granted on motion of plaintiffs-appellees Eclipse Enterprises, Inc., doing business as Eclipse Comics, and Wantagh Distributors, Inc., doing business as Collectors Comics (collectively with plaintiffs-appellees Eclipse Enterprises, Inc., "Eclipse"). In finding in favor of Eclipse, a publisher and a seller of trading cards, the court determined, inter alia, that Nassau County Local Law 11-1992 (the "Law"), which prohibits the sale to minors of any trading card that depicts a heinous crime, an element of a heinous crime or a heinous criminal, and is harmful to minors, is a content-based prohibition of speech and is neither necessary nor narrowly tailored to meet a compelling state interest.
 
 
 2
 For the reasons that follow, we affirm.
 
 BACKGROUND
 
 3
 Eclipse Enterprises, Inc. has published several sets of trading cards that include pictures or drawings of famous criminals as well as information about their lives and the crimes they committed. These cards have been sold by set in book stores and trading card shops throughout the country since 1988. Among these card sets are "Coup D'etat," which presents theories pertaining to the assassination of President John F. Kennedy; "Friendly Dictators," which details U.S. support of authoritarian regimes and murderous dictators; "Drug Wars," which discusses crimes associated with Prohibition and drug trafficking; "Crime and Punishment," which depicts scenes from trials of heinous criminals; and "True Crime," which presents information about serial killers and gangsters.
 
 
 4
 Local Law 11-1992, which was enacted by the Board of Supervisors of Nassau County, became operative on June 16, 1992. Section 3 of the Law states:
 
 
 5
 A person is guilty of disseminating indecent crime material to minors when, with knowledge of its character and content, he sells or loans to a minor for monetary consideration in Nassau County any trading card which depicts a heinous crime, an element of a heinous crime, or a heinous criminal and which is harmful to minors. Disseminating indecent crime material to minors shall be a Class A misdemeanor.
 
 
 6
 Definitions of the terms used in the Law are found in Section 2. A "Minor" means any person under the age of seventeen. A "Trading Card" encompasses "any card ... commonly known as a trading card." A "Heinous Crime" is defined as "murder, assault, kidnapping, arson, burglary, robbery, rape or other sexual offense." Finally, a card is "Harmful to Minors" if it:
 
 
 7
 1. Considered as a whole, appeals to the depraved interest of minors in crime; and
 
 
 8
 2. Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
 
 
 9
 3. Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.
 
 
 10
 Section 1 provides that the legislative intent of the Law is to protect Nassau County children from materials that depict "heinous crimes and heinous criminals." The County considers such materials to be "a contributing factor to juvenile crime, a basic factor in impairing the ethical and moral development of our youth and a clear and present danger to the citizens of Nassau County." Section 1 further provides that the County has an "exigent interest" in protecting its children by "preventing the distribution to children of material deemed harmful to children." It concludes that when "cards which depict heinous crimes and heinous criminals and which appeal to the depraved interest of minors in crime are disseminated to our youth, they are harmful."
 
 
 11
 Eclipse initiated the action giving rise to this appeal pursuant to 42 U.S.C. § 1983, seeking a judgment declaring the Law unconstitutional under the First, Fifth and Fourteenth Amendments of the United States Constitution and Article I, Sections 6, 8, and 11 of the New York State Constitution. In the complaint, Eclipse sought a declaration that the Law is invalid on its face, an injunction against the enforcement of the Law, money damages and attorneys' fees. Both parties moved for summary judgment. On November 12, 1993, the district court denied both motions for summary judgment without prejudice and subject to later renewal, and ordered that an evidentiary hearing be held before a magistrate judge. See Fed.R.Civ.P. 43(e).
 
 
 12
 Accordingly, in March of 1994, an evidentiary hearing was held before Magistrate Judge Michael L. Orenstein, who was directed by the district court to consider the following:
 
 
 13
 Whether Nassau County Local Law 1992 is narrowly tailored, i.e., employs the least restrictive means available, to serve the County's compelling interest in providing for the well-being of minors and otherwise serving the legislative intent underlying the statute.
 
 
 14
 At the hearing, Eclipse presented a number of witnesses, including Catherine Yronwode, the editor-in-chief of Eclipse Enterprises, Inc., who testified regarding the long history of crime trading cards and provided details about the Eclipse crime cards in question; Donald Parker, a retired Nassau County high school social studies teacher, who testified about books and materials he used in class containing information about violent crime; and Martha Harris, a Nassau County public librarian, who testified as to the many books containing descriptions and depictions of crimes that are available to Nassau County's young people.
 
 
 15
 Eclipse also presented several expert witnesses, including Dr. Joyce Sprafkin, a clinical psychologist who has published several articles on the effects of television ("TV") violence on the behavior of children; Dr. Jonathan Freedman, whose background is similar to that of Dr. Sprafkin; and Dr. Fred Berlin, a psychiatrist who specializes in psychotic criminal behavior and who has treated numerous violent adolescents. Freedman testified that TV violence studies do not provide strong evidence that TV violence causes criminal behavior or aggression and that TV is a far more powerful medium than trading cards. Sprafkin and Berlin testified that they had never evaluated a child who exhibited aggression or violence as a result of being exposed to crime trading cards. Both Freedman and Berlin testified that there is no research demonstrating that such cards are harmful to children. Additionally, Berlin testified that the environmental risk factors he had identified as contributing to adolescent criminal behavior included child abuse, drugs, alcohol, and gang membership.
 
 
 16
 The County presented the testimony of Dr. Sandra Kaplan, a pediatrician and psychiatrist; Miriam Miedzian, who holds a doctorate in philosophy and a masters degree in clinical social work; Supervisor Gregory Peterson, one of the authors of the Law; Graceann Smigiel, a victims' rights advocate; and two clergymen, Rabbi Marc Gellman and Monsignor Thomas Hartman. Kaplan, Miedzian, Smigiel, Hartman and Gellman all testified that, in their opinions, the trading cards in question glorify criminals and trivialize their crimes. Kaplan and Miedzian added that because of this glorification, children would be inclined to imitate the crimes depicted on the cards. However, Kaplan, Miedzian, Hartman and Gellman all admitted that they knew of no studies connecting crime trading cards or any other reading material to violent behavior in children and that they knew of no particular incidents of violent behavior in children that could be attributed to crime trading cards.
 
 
 17
 Peterson testified that, through personal experience and conversations with the community, he and the rest of the Board of Supervisors found that the cards had no socially redeeming value, and that the cards contributed to juvenile crime. However, Peterson also admitted that the Board's conclusions were based upon sheer surmise, and that he was unaware of any studies or actual criminal incidents in which the crime trading cards had been linked to juvenile crime.
 
 
 18
 In October of 1994, the magistrate judge issued a Report and Recommendation finding the Law unconstitutional. He determined that "speech which contains depictions of crime or violence is not considered obscene and thus is accorded the protection of the First Amendment." He also found that the Law is a content-based restriction on speech that fails to survive strict scrutiny analysis and that it is both vague and overbroad. In finding that the Law failed the strict scrutiny test, the magistrate judge observed that "no credible or empirical evidence was presented from which this Court could conclude that the trading cards cause juvenile crime or impair moral and ethical development." In October of 1995, the County filed objections to the Report and Recommendation. In response to the objections, Eclipse renewed its motion for summary judgment.
 
 
 19
 On September 26, 1996, the district court issued a Memorandum of Decision and Order in which it "determined that speech containing or depicting acts of violence is safeguarded by the First Amendment", and in which it adopted the magistrate judge's Report and Recommendation insofar as the Report and Recommendation determined that (1) the Law "is a content-based restriction", and (2) "Nassau County Local Law 11-1992 is unconstitutional because it is not narrowly tailored to meet a compelling state interest." On December 12, 1996, the district court issued an order granting summary judgment in favor of plaintiffs and declaring the Law invalid on its face under the First Amendment. The district court also permanently enjoined enforcement of the Law and awarded fees and costs to Eclipse. This appeal followed.
 
 DISCUSSION
 A. Content-based Restriction on Speech
 
 20
 If speech subject to regulation is of the protected category, then the regulating statute must pass strict scrutiny if the regulation is content-based, or a less rigorous examination if it is content-neutral. Accordingly, when examining the constitutionality of a statute restricting speech, the threshold determination is whether the speech is of a protected category, and, if so, whether the statute, taken as a whole, is content-based or content-neutral. The Supreme Court historically has confined the categories of unprotected speech to defamation, fighting words, direct incitement of lawless action, and obscenity. See R.A.V. v. City of St. Paul, 505 U.S. 377, 382-83, 112 S.Ct. 2538, 2542-43, 120 L.Ed.2d 305 (1992)("[This] limited categorical approach has remained an important part of our First Amendment jurisprudence."). We decline any invitation to expand these narrow categories of speech to include depictions of violence. We therefore conclude that the Law regulates protected speech and turn to the question whether the regulation is content-based.
 
 
 21
 Content-based regulations, as the name implies, restrict speech because of its content. See generally Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 642-43, 114 S.Ct. 2445, 2459-60, 129 L.Ed.2d 497 (1994). Content-neutral regulations, by contrast, are promulgated "without reference to the content of the regulated speech." Madsen v. Women's Health Ctr., 512 U.S. 753, 763, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593 (1994) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)).
 
 
 22
 The County argues that the district court erred in finding that the Law is content-based. In particular, it argues that the Law is content-neutral. The district court, however, properly concluded that the Law specifically targets the description of heinous crimes or heinous criminals in trading cards and, therefore, is content-based. Eclipse Enterprises, Inc. v. Gulotta, 942 F.Supp. 801, 808 (E.D.N.Y.1996). The Law focuses on the information contained in the trading cards. Accordingly, in order for the Law to be upheld, it must survive strict constitutional scrutiny.
 
 B. Strict Scrutiny
 
 23
 A content-based restriction on speech is presumptively invalid. See R.A.V., 505 U.S. at 382, 112 S.Ct. at 2542; see also City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S.Ct. 925, 928-29, 89 L.Ed.2d 29 (1986) ("This Court has long held that regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment."). Accordingly, the County must show that the Law "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (citation omitted). The First Amendment thus imposes a high standard of precision on legislative efforts to regulate the content of speech.
 
 
 24
 There is no dispute that the County has a compelling interest in protecting the psychological well-being of minors and in combatting juvenile crime.[1] However, the County argues that the district court erred in finding that the Law was neither necessary nor narrowly drawn to protect the County's youth and to combat juvenile crime. In particular, the County claims that it had the right to enact the Law based upon "experience, knowledge and common sense" in the absence of any empirical proof that the Law would serve any of the County's articulated interests.
 
 
 25
 The Supreme Court has held that the government must present substantial supporting evidence in order for a regulation that threatens speech to be upheld. Specifically, the Court has stated that speculation or surmise is insufficient:
 
 
 26
 When the Government defends a regulation on speech as a means to ... prevent anticipated harms, it must do more than simply posit the existence of the disease to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.
 
 
 27
 Turner, 512 U.S. at 664, 114 S.Ct. at 2470 (quotation and citation omitted).
 
 
 28
 In the present case, the Nassau County Board of Supervisors patterned the Law's definition of "harmful to minors" after the standard for obscenity that the Supreme Court delineated in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Nassau County Board of Supervisors simply adapted the Miller standard to minors and to violence. However, this was not a sufficient measure to shield the Law from a successful constitutional challenge, because the standards that apply to obscenity are different from those that apply to violence. Obscenity is not protected speech. See generally Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
 
 
 29
 For the purposes of this opinion, we do not find it necessary to determine whether carefully delimited and properly tailored restrictions on distribution of non-obscene but otherwise harmful speech to minors, especially younger minors, can ever pass the strict scrutiny test. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Reno v. American Civil Liberties Union, --- U.S. ----, ----, 117 S.Ct. 2329, 2341, 138 L.Ed.2d 874 (1997). Suffice it to say, we do not find support in the record here for the conclusion that a prohibition on the sale of crime trading cards is a necessary or effective way to serve the compelling state interests articulated by defendants-appellants.
 
 
 30
 Other than contested studies concerning TV violence, the conclusory and contradictory testimony of its own experts, and conclusory testimony of community activists, the County did not provide any support for its contention that the crime trading cards are either harmful to minors or contribute to juvenile crime. Indeed, the County's own experts as well as Supervisor Peterson--one of the drafters of the Law--all admitted that they knew of no studies or actual occurrences where crime trading cards were determined to be a factor in juvenile violence. Peterson also admitted that the Law was drafted on the basis of surmise. Eclipse's experts testified that they knew of no study or case where crime cards had been linked to juvenile crimes. These experts also testified that TV violence research was inconclusive and unreliable as it related to juvenile violence or aggression. Because TV is a more vibrant medium than trading cards, the experts indicated that such research could not, in any event, provide support for the proposition that crime trading cards, even those that glorify crime and minimize its consequences, cause young people harm or increase the risk of juvenile violence.[2]
 
 
 31
 Moreover, there has been no showing why trading cards should be singled out for regulation in preference to other material that is no less noxious. For example, books found in the County library and, at least according to one teacher, used in the classroom, contain descriptions of crimes and criminals no different from the information and depictions found in the crime trading cards. The First Amendment imposes a high standard of precision on legislative efforts to regulate content-based speech, and the Law under scrutiny here simply does not meet that standard. We hold that the Law is unconstitutional under the First Amendment because it is neither narrowly tailored nor necessary to protect Nassau County's young people.
 
 CONCLUSION
 
 32
 For all of the above reasons, we affirm the judgment of the district court to the extent that it determined that the Law is a content-based restriction on speech that does not survive strict scrutiny.
 
 GRIESA, District Judge, concurring:
 
 33
 I concur in the result, and wish to present certain additional explanations.
 
 
 34
 The majority opinion states that Nassau County Local Law 11-1992 is neither necessary nor narrowly tailored to meet a compelling state interest. However, there is no analysis in the majority opinion as to why the particular language and terms of the Local Law suffer from these deficiencies. While the law is quoted in the introductory portion of the opinion, when it comes to analyzing why the law fails to pass the strict scrutiny test, the language of the law is not mentioned. Instead there is merely a reference to "a prohibition on the sale of crime trading cards." But the Nassau County Board of Supervisors did not simply pass a general, unqualified law prohibiting the sale of crime trading cards to minors, but went to some pains to articulate a law which, at least to some extent, is "narrowly tailored" to meet an admittedly compelling interest in protecting the psychological well-being of minors and in combating juvenile crime. It seems to me to be appropriate to take the law as actually drafted and to consider whether that law passes constitutional muster.
 
 
 35
 Also, I believe that the case is closer and less one-sided than is indicated by the majority opinion. In my view, to the extent the position of the County has merit, it is only fair to recognize this, particularly since we are dealing with a local legislative body and its effort to ensure the welfare of juveniles and to protect against juvenile crime, worthy objectives indeed.
 
 
 36
 Section 1 of Local Law 11-1992 is entitled "Legislative Intent" and states:
 
 
 37
 The Board of Supervisors finds that in light of their limited experience, education and emotional development, children under the age of seventeen are impressionable and susceptible to the influence of violence and criminal conduct in our society. The dissemination of materials devoted to the depiction of heinous crimes and heinous criminals is a contributing factor to juvenile crime, a basic factor in impairing the ethical and moral development of our youth and a clear and present danger to the citizens of Nassau County. The County has a responsibility and an exigent interest to protect the welfare of its children and to see that they are safeguarded from influences which might prevent their growth into free and independent well-developed citizens by preventing the distribution to children of material deemed harmful to children.
 
 
 38
 The Board of Supervisors further finds that for generations, children have purchased and collected trading cards depicting war heroes, sports heroes and other luminaries whom they revere and emulate. In such form, trading cards are not harmful to children. When, however, trading cards which depict heinous crimes and heinous criminals and which appeal to the depraved interest of minors in crime are disseminated to our youth, they are harmful.
 
 
 39
 Section 3 is headed "Disseminating Indecent Crime Material to Minors," and provides:
 
 
 40
 A person is guilty of disseminating indecent crime material to minors when, with knowledge of its character and content, he sells or loans to a minor for monetary consideration in Nassau County any trading card which depicts a heinous crime, an element of a heinous crime, or a heinous criminal and which is harmful to minors. Disseminating indecent crime material to minors shall be a Class A misdemeanor.
 
 
 41
 Section 2 contains definitions, and defines "heinous crime" to mean murder, assault, kidnaping, arson, burglary, robbery, rape or other sexual offense. "Heinous criminal" means a person who has been convicted of a heinous crime or who has been found not responsible for the commission of such a crime by reason of mental disease or defect. Section 2.E provides:
 
 
 42
 E. "Harmful to Minors" means that quality of any description or representation in whatever form of a heinous crime, an element of a heinous crime or heinous criminal, when it:
 
 
 43
 1. Considered as a whole, appeals to the depraved interest of minors in crime; and
 
 
 44
 2. Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
 
 
 45
 3. Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.
 
 
 46
 The law is obviously modeled after the standard established by the Supreme Court for dealing with obscenity. The statement of legislative intent in Section 1 contains a number of passages found in Justice Brennan's majority opinion in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)--both statements by Justice Brennan and statements quoted by him from other sources. The three-part definition of "harmful to minors" is based to some extent upon the definition of obscenity found in Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614-15, 37 L.Ed.2d 419 (1973). The phrase "depraved interest of minors in crime" in the Local Law is substituted for "prurient interest" in the obscenity definition.
 
 
 47
 If the analogy to obscenity were a mere gimmick--if the Supervisors were only trying to clothe themselves in false colors--that would be one thing. However, in my view, the analogy to obscenity, while not perfect, and while not placing violence and crime in the same legal category as obscenity, nevertheless has substance from a factual standpoint. As to the legal category, I agree with the majority opinion that portrayals of violence and crime are not, like obscenity, completely outside the protection of the First Amendment, and that the Local Law in question is a content-based restriction on speech which is subject to strict scrutiny to determine its constitutionality. Still it was reasonable for the Supervisors to use the obscenity analogy to the extent that facts and circumstances made it logical to do so.
 
 
 48
 The obscenity standard is derived in large part from the realization that there have been, and will be, masses of writings, films, paintings, sculptures, etc. dealing with sex and nudity. Only a narrow category constitutes "obscenity" beyond First Amendment protection.
 
 
 49
 In the case of violence and crime, all kinds of depictions exist both by way of fiction and non-fiction. If there is a category that can be banned without violating the First Amendment, it would surely be most restricted. Thus, in fashioning such a ban, there would need to be, as in the case of obscenity, exclusions for the large body of materials routinely circulated and available in any community.
 
 
 50
 Thus, subsections E.2 and E.3 of Local Law 11-1992 are designed to immunize from the prohibitions of the law the great mass of writings about violence and crime that find their way into homes, libraries, and movie theaters. What is prohibited by the law according to subsection E.1 are crime trading cards which appeal to "the depraved interest of minors in crime."
 
 
 51
 In my view, the Supervisors made a conscientious attempt to enact a narrowly drawn law to protect the well-being of juveniles and to combat juvenile crime. The question remains whether that effort is sufficient to pass constitutional muster. In answering this question, it is only fair to take into account the evidence about the kind of crime trading cards that the Board of Supervisors had in mind when it passed Local Law 11-1992.
 
 
 52
 Supervisor Gregory Peterson testified regarding the particular cards that impelled the enactment of the law. They were introduced as Defendants' Exhibits 2, 3 and 4 at the hearing. Exhibit 2 consists of cards from a series entitled "Famous 52 Murders." Exhibit 3 is from the series entitled "Cold Blooded Killers Trading Cards, A Collection of Mad Men." Exhibit 4 is from the series "Incredible True Life Murderers." Most of the cards consist of a drawing of the criminal on one side and a narrative on the other side. A few examples will show the nature of these cards. Two of the cards deal with Ian Brady and Myra Hindley, who were criminal partners. The cards describe how Brady mutilated animals as a "young kid." After he teamed up with Hinley, they perpetrated sexual molestations and murders on "the very young," performing sexual acts during the murders in order to obtain orgasm, all of which was filmed. Another of the cards depicted Edmund Emil Kemper, who had sadistic fantasies in his early teens and cut the family cat into pieces. He shot and stabbed his father and stepmother to avenge his parents' separation. On several occasions, he picked up girls, murdered and dismembered them. On one occasion he engaged in sex acts with the body of a decapitated girl. Finally, he killed his mother and cut out her larynx because she talked too much. Another card described Dean Allen Corll, who killed at least 27 young teenage boys after sodomizing them. He removed the genitals of some and used a dildo in various sexual acts. Still another card dealt with Albert Fish, who inserted sharp needles into his own genitals to increase his sexual sensations. He killed a 12 year old girl, cut her head off, then dismembered her and stewed her flesh and organs with vegetables for a meal.
 
 
 53
 If the case were limited to the question of whether these types of cards could be prohibited, there would surely be a strong argument in favor of the County on the constitutional question. In my view, Supervisor Peterson and his fellow supervisors had a basis for believing that they were dealing with materials that could create the most depraved kinds of images in the minds of juveniles. To be sure, Peterson admitted in his testimony that the supervisors did not receive reports or statements from psychologists and psychiatrists, but he stated that his support for the law was based upon his experience as a father, as a lawyer, and as someone who has dealt with youth in the community and has dealt with the schools.
 
 
 54
 The majority opinion states that Peterson admitted that the Local Law was drafted on the basis of surmise. Although Peterson did adopt the cross-examiner's word "surmise" in two of his answers, Peterson was obviously referring to inferences and judgments based on the cards themselves and his experience in the community.
 
 
 55
 The majority opinion gives great weight to the absence of expert studies to justify the law. In this connection, Justice Brennan's discussion in Ginsberg v. New York, 390 U.S. at 641-43, 88 S.Ct. at 1281-83, is apt. Dealing with the issue of the effect of obscenity on minors, he stated that there was no lack of studies demonstrating that obscenity is or is not harmful. He concluded by stating that scientifically certain criteria is not demanded of legislators.
 
 
 56
 Despite all that I have said about the attempts to narrowly draw the law, and about the evidence regarding certain types of crime trading cards which might constitutionally be prohibited, there remains a serious problem which prevents the County from succeeding in this action. In addition to the types of trading cards previously described, there are large numbers of other crime trading cards in evidence. For instance, there is a series of cards dealing with the assassination of President Kennedy. There are sets of cards dealing with criminal trials. There are cards describing the careers of famous criminals such as Al Capone. The descriptions in these cards are what might be found in any widely circulated news articles or historical works. There is no possibility that the First Amendment permits the banning of the sale of such cards to either adults or minors.
 
 
 57
 In this litigation, the County has offered no satisfactory definition or limitation on the types of trading cards it would find to be within the prohibition of Local Law 11-1992. The County has not taken the position that the application of the Local Law would be limited to the kinds of cards described by Supervisor Peterson. The County's brief states:
 
 
 58
 Trading cards that present crimes in a sensationalized manner, confusing violence and humor, and that look cartoonlike or contain a psychedelic emphasis are indicative of inappropriate cards.
 
 
 59
 The County further advises that, where infamous crimes are depicted, a purveyor of crime trading cards can avoid the ban of the Local Law if the cards show "the punishment as well as the crime," and indicate a "critical" view of criminal behavior. The criteria articulated by the County in its brief offer little in the way of satisfactory limits, and indeed would inject a degree of interference with the contents of published materials which cannot be constitutionally justified.
 
 
 60
 This points to the ultimate problem with the County's case. The definition in the Local Law, "appeals to the depraved interest of minors in crime," while by no means devoid of meaning, is not sufficiently precise. Indeed, since the supervisors modeled the Local Law on the obscenity standard, it must be noted that they did not go far enough in embodying that standard. In Miller v. California, supra, the Court stated that the permissible scope of the regulation of obscenity was confined to works that depicted or described sexual conduct. The Court stated further:
 
 
 61
 That conduct must be specifically defined by the applicable state law, as written or authoritatively construed.
 
 
 62
 Id. at 25, 93 S.Ct. at 2615. In describing the guidelines to be used in determining whether a work is obscene, the Court stated that one part of the test is whether the work "appeals to the prurient interest." But the Court added that another part of the test is whether the work "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." Id. at 24, 93 S.Ct. at 2614-15 (emphasis added). Finally, the Court gave examples of what a state statute "could define for regulation," including representations of ultimate sex acts and lewd exhibition of bodily parts. Id. at 25, 93 S.Ct. at 2615. The Supreme Court recently reaffirmed the views expressed in Miller. See, Reno v. American Civil Liberties Union, --- U.S. ----, ----, 117 S.Ct. 2329, 2332, 138 L.Ed.2d 874 (1997).
 
 
 63
 Local Law 11-1992 is not drafted with the kind of specificity referred to in Miller and Reno. Whether a law dealing with depictions of violence and crime could actually be enacted to meet constitutional standards is surely debatable. But Local Law 11-1992 certainly does not go the necessary distance. For one thing, there is no language which attempts to limit the law to the kinds of cards the supervisors were referring to when they enacted the law.
 
 
 64
 An Eighth Circuit decision is closely on point. Video Software Dealers Ass'n. v. Webster, 968 F.2d 684 (8th Cir.1992), dealt with a Missouri statute that prohibited the rental or sale of certain videos to minors. As in the present case, the statute had a three-part definition of the types of videos prohibited, modeled after the obscenity standard. The first part of the definition provided that videos were prohibited which would have "a tendency to cater or appeal to morbid interest in violence for persons under the age of 17." The court held that the statute was not narrowly drawn as constitutionally required, and was unconstitutionally vague. The statutory language about "morbid interest in violence" did not clearly identify the targeted material. The State had argued inconsistently about the meaning of the law, one time putting forth a very broad application, and another time arguing that it was limited to "slasher" videos displaying bestial and graphic scenes of murder, rape, masochism, mutilations and assorted perversions. The court noted the State's inconsistency and noted that the statute itself was not, by its terms, limited to slasher videos, although a more precise law limited to such slasher films would be "less burdensome on protected expression." Id. at 689.
 
 
 65
 I conclude that, although there is considerable substance to the evidence and the arguments presented by the County, Local Law 11-1992 is not drawn in a sufficiently narrow and clear manner and thus violates the First Amendment.
 
 
 
 *
 The Honorable Thomas P. Griesa, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Eclipse does not challenge the finding of the district court that these are compelling state interests. See Brief for Appellees at 29. As the Supreme Court stated in New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 3354-55, 73 L.Ed.2d 1113 (1982), "[i]t is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling" (quotation and citation omitted). See also Schall v. Martin, 467 U.S. 253, 264, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (quotation and citation omitted)
 
 
 [2]
 Notably, the crime trading cards merely contain pictorial depictions of the criminals and an abridged description of their lives and criminal activity. By contrast, the TV violence studies were based on active, and often graphic, violence